UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NOVASTAR APPRAISALS, INC.                    :
d/b/a/ GREEN DONATIONS CONSULANTS            :
and PATRICK M. SMITH,                        :
6905 Lakeland Way                            :
Fredericksburg, VA  22407,                   :
                                             :
        Plaintiffs,                          :
                                             :
v.                                           :        Civil Action No.
                                             :
UNITED STATES OF AMERICA,                    :
PAMELA JO BONDI, ATTORNEY GENERAL,           :
And                                          :
INTERNAL REVENUE SERVICE,                    :
950 Pennsylvania Avenue, N.W.,               :
Washington, DC  20530,                       :
                                             :
        Defendants.                          :

COMPLAINT FOR DECLARATORY
JUDGMENT AND OTHER RELIEF

NOW COMES NoVaStar Appraisals, Inc. ("NoVaStar") d/b/a Green Donations

Consultants and Patrick M. Smith (collectively "GDC" or "Plaintiffs" except where either

NoVaStar, GDC or Mr. Smith is specifically referred to by name), and for their Complaint for

Declaratory Judgment and Other Relief ("Complaint") against the Defendants the United States,

Attorney General Pamela Jo Bondi, and Internal Revenue Service ("IRS" or "Defendants"), state

as follows:

**INTRODUCTION**

1. The Plaintiffs bring this Complaint for Declaratory Judgment and Other Relief

   ("Complaint") pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 5, for non-monetary

   declaratory relief, in particular, a judicial ruling stating whether or not the Plaintiffs'

1

business practices and valuation methodologies comply with all applicable statutes, regulations and rules.[1]

2.   As described in detail below, this Complaint for a Declaratory Judgment arises out of an immediate and pressing need for a declaratory judicial ruling about the proper interpretation and application of IRS statutes and regulations governing the Plaintiff's appraisal valuation methodology and associated business practices.

3.   As more specifically alleged below, the IRS's own regulations and publications, and established case law, state that every appraisal of a non-cash charitable donation, such as the deconstructed building materials for which the Plaintiffs provide appraisals, must take into account all the facts and circumstances of the particular donation in making the key determination of Fair Market Value (sometimes "FMV") for tax purposes.

4.   The IRS's own regulations and rules and established case law provide for three (3) basic appraisal methods of determining FMV for tax purposes, which can be used singly or in combination depending on the donation-specific circumstances.

---

[1] The Plaintiffs are fully aware of and seek to honor Fed. R. Civ. P. 8(a)'s requirements of "a short and plain statement of the grounds for the court's jurisdiction" and "a short and plain statement of the claim showing that the pleader is entitled to relief." But the mandates of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), generally applied to require a Complaint to provide detailed factual allegations to demonstrate the "plausibility" of the Plaintiffs' claims; the judicially-noticeable complexities of the many Internal Revenue Code statutes and regulations relevant to the Complaint; the highly particularized nature of the Plaintiffs' business and the operation of the I.R.S.'s application of its rules and regulations to that business; the discretionary nature of Declaratory Judgment relief; and the legally intricate nature of the dispute on which the Plaintiffs' seek Declaratory Judgment guidance, compel a lengthier and more detailed explanation of the case and legal issues implicated in its resolution, and serve the purposes of Fed. R. Civ. P. 1, that the rules should be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."

5.   The IRS-specified three (3) basic appraisal methods for determining FMV for tax purposes are the "Comparable Sales Method;" the "Cost-Less-Depreciation Method; and the "Income Method."  The Income Method is often of little relevance to valuations of deconstructed building materials because the Income Method "determines fair market value by discounting to present value the expected future cashflows from the property," and "is a speculative valuation method most often used to value the projected cashflows of a business." *Veribest Vesta, LLC v. Commissioner*, 2025 WL 1939887, at * 16 (T.C. July 15, 2025) (citing *Chapman Glen Ltd. v. Commissioner*, 140 TC 294, 327 (2013), and *J.L. Minerals, LLC v. Commissioner,* T.C. Memo. 2024-93, at * 63, respectively (other citations omitted)).

6.   The IRS has engaged in a campaign of selectively, automatically, arbitrarily, capriciously and systematically rejecting as "unqualified" the FMV appraisals performed by the Plaintiffs based on the Cost-Less-Depreciation method, and, therefore, rejecting the Plaintiffs' clients' charitable donation deductions for donations to Second Chance, Inc., a qualified Section 501(c)(3) donee organization described in detail below.

7.   The Plaintiffs perform their FMV appraisals for tax purposes primarily through Mr. Smith, a highly experienced Qualified Appraiser who complies with all applicable IRS regulations, rules and requirements in providing appraisals valuing taxpayers' charitable donations of deconstructed building materials to Second Chance.

8.   As alleged below, the IRS's rejection of the Plaintiffs' appraisals for Second Chance donors appears to result, at least in part, from the IRS's previously expressed negative view of Second Chance, rather than from a defensible application of the governing rules and regulations to the Plaintiffs' appraisals.  Those rules and regulations are rooted in the

fundamental principle that "each valuation case is destined to turn on its particular facts and circumstances, given the application of certain legal principles." *Pensacola Greyhound Racing, Inc. v. Commissioner,* T.C. Memo. 1973-225, 1973 WL 2404 (finding "combined cost replacement and residual appraisal method may be appropriately utilized here, for it is an acceptable alternative where the income and comparative sales methods are not useful").

9.  The Plaintiffs have been following the IRS's rules and regulations, using the same approach to determining the most appropriate appraisal method(s) to use, and the same implementations of those methods, successfully for many years.  The Plaintiffs continue to use those methods for their clients who donate to donees pursuant to IRS Section 501(c)(3) other than Second Chance, without such IRS rejections.  This situation – "Plaintiffs' appraisals rejected when used by Second Chance donors but accepted when used by donors to other charitable organizations" - has created great uncertainty about the governing legal rules applicable to the Plaintiffs' business, and necessitates a judicial declaration of the correct understanding and application of the IRS statutes and rules governing Plaintiffs' appraisals.

10. Illustrating the confusion created by the IRS's inconsistent application of the rules and regulations governing qualified appraisals for charitable deductions of deconstructed building materials, the IRS has continued broadly to approve such appraisals that employ the "Comparable Sales Method" for valuing donated items even though the market for used building materials is, as shown below,  and as reflected by the studies discussed below, thin, variable over time, and highly fragmented geographically, economically and in regulatory requirements.

11. The IRS has, on information and belief, continued to accept Comparable Sales valuation FMV appraisals for tax purposes, even though the "comparable sales" are based on transactions in geographic areas thousands of miles distant from the market in which the donation is being made, with, on information and belief, the IRS requiring no demonstration that the economic and regulatory conditions in the markets from which the far-flung supposed "comparable" values are derived are even remotely similar to the market conditions in the market in which the actual donation is being valued.

12. Further putting into stark relief the confusion resulting from the IRS's idiosyncratic and inconsistent approach to valuations of non-cash donations of deconstructed building materials, while routinely rejecting Cost-Less-Depreciation appraisals for donations to Second Chance, the IRS has continued to accept Cost-Less-Depreciation appraisals for donations to charitable organizations other than Second Chance. In fact, the IRS recently approved a charitable non-cash donation of deconstructed commercial building materials, based on multi-million dollar valuation by the Plaintiffs, which used the Cost-Less-Depreciation appraisal method to establish the FMV of the donated materials.

13. And yet further, as discussed in greater detail below, one large deconstruction industry participant touts its enormous success in obtaining deconstruction deductions for its donors, based on "replacement cost" appraisals performed by a *real estate appraiser* rather than an appraiser qualified to value deconstructed structural components, which, to all appearances, is irreconcilable with the IRS's own numerous and detailed requirements for an appraiser to be qualified to provide FMV valuations of deconstructed structural items for tax purposes.

14. Creating a chaotic and inconsistent regulatory scheme, the IRS routinely: (i) accepts appraisal valuations based on the Comparable Sales method, but in which the allegedly comparable sales are, on information and belief, neither truly comparable nor required to be demonstrated to be comparable; (ii) accepts appraisal valuations based on the Cost-Less-Depreciation methodology where the donated materials are going to charitable organizations other than Second Chance; (iii) rejects the Plaintiff's Cost-Less-Depreciation appraisal valuations when done for donors to Second Chance but approves the Plaintiffs' use of the Cost-Less-Depreciation valuation method when employed for donors to charitable organizations other than Second Chance; and (iv) in systematically rejecting Cost-Less-Depreciation appraisals provided to Second Chance donors, ignores its own published rules and established case law teaching that three valid appraisal methods exist and should be used singly or in combination depending on the facts and circumstances of the particular case.

15. Deepening the morass the IRS has created, and as alleged below in substantial factual detail, the IRS's rejection of the Plaintiffs' appraisals as "unqualified," when these appraisals are used by donors to Second Chance, contradicts long-established touchstone principles for IRS analysis of the tax effects of transactions: first, the "economic substance doctrine" and second, relatedly, the "form over substance doctrine." All of the Plaintiffs' appraisals involve real donors, making real, substantial and documented charitable donations to a qualified charitable organization that itself provides socially valuable workforce training to many otherwise unemployed or underemployed workers, while keeping dangerous materials out of landfills and preserving and recycling useful

items and historical building features for new purposes.  The transactions that the IRS is attacking are the opposite of "sham transactions."

16. The IRS's seemingly arbitrary treatment of valuation appraisals is not just a theoretical or otherwise abstract problem.  Rather, the IRS's regulatory enforcement hodgepodge has real-world consequences.

17. The IRS assessed a $22,000 penalty on Plaintiff Smith ($1,000 penalty for each of twenty-two (22) appraisals), for what the IRS alleges was the Plaintiffs "aiding and abetting" what the IRS claims were tax underpayments by charitable donors to Second Chance for whom the Plaintiffs had provided Cost-Less-Depreciation deconstruction appraisals (the "Audited Donors").  *See* Exhibit 1.

18. After a highly confusing and lengthy series of exchanges with the IRS about the penalty assessment, making an initial refund claim-preserving 15% payment, and incurring substantial legal fees in that byzantine and frustrating process, Plaintiff Smith, desiring to avoid unwarranted, but repeatedly threatened, levies, seizures and further imposition of interest charges, entered into a three-year repayment program with the IRS, while reserving all rights to challenge the penalty imposed.   *See* Exhibit 2. Ultimately, on or about September 3, 2025, the IRS unilaterally offset Plaintiff Smith's tax refund for the "tax period ending December 31, 2020" against the remaining penalty balance.

19. A Declaratory Judgment is required to establish, once and for all, the "Rules of the Regulatory Road" so that the Plaintiffs, and other similarly situated appraisers, will know what they are and are not supposed to do.

**Background: Green Donations Consultants' Social and Environmental Mission**

20. Patrick M. Smith established NoVaStar Appraisals, Inc., a real estate appraisal business, in 2005 in Fredericksburg, Virginia.

21. Seeking a socially beneficial way of operating a commercial business, in 2010, Mr. Smith changed his company's focus to performing appraisals of whole houses that were to be deconstructed rather than demolished, with the salvaged materials going to charitable donee organizations for re-use, re-sale and recycling instead of the environmentally perilous practice of dumping often toxic used building materials in landfills.

22. After earning the Master Personal Property Appraiser designation from the National Association of Auctioneers, the Certified Personal Property Appraiser designation from the Certified Appraisers Guild of America, and becoming an Accredited Member of the International Society of Appraisers, Mr. Smith expanded his company's offerings to include appraisals of all manner of personal property for charitable donations, appraising materials from large commercial structures and residential buildings and houses.

23. In 2017 Mr. Smith rebranded NoVaStar as Green Donations Consultants, which not only provides appraisals of donated items, but offers consulting services at every step of the charitable donation process. GDC has worked on over 2,500 deconstructed properties, commercial and residential, large and small, involving donated materials collectively valued at approximately $275 MM, with over one million tons of deconstructed building materials diverted from landfills.

**IRS-Targeted Charitable Donee Organization – Second Chance**

24. Because the IRS's selective challenges to Plaintiffs' appraisal practices involve Plaintiffs' clients who donate to Second Chance as opposed to other charitable organizations, a

description of Second Chance and its charitable mission is necessary to put the Plaintiff's allegations into their proper context.

25. Founded in 2001, Second Chance is a non-profit organization, certified as a charitable organization under I.R.C. § 501(c)(3). Executing charitable donation contracts with donors, Second Chance takes ownership of personal property - buildings and residences, constructively severed from the underlying real estate - from those donors. Second Chance then deconstructs those structures, salvages large amounts of re-usable building materials, and makes those materials and other items donated to Second Chance available to the public at Second Chance's over 200,000 square foot warehouse in Baltimore for purchase and re-use.

26. Second Chance's business serves three important purposes. First, Second Chance's mission protects the environment by preventing the environmentally unsound and costly landfilling of such materials and items. *See* Department of the Army, Public Works Technical Bulletin No. PWTB 200-1-26, April 30, 2005, at 2 ("Disposing of demolition debris in landfills is expensive. It wastes natural resources and valuable landfill space."). *See also id.* at A-1 ("Disposing of demolition debris in landfills is both economically and environmentally costly…."). Relatedly, because deconstruction requires much more care than simple demolition so as to enable the teaching of workforce trainees in construction methods and to preserve the integrity and value of the deconstructed items, fewer toxic materials, such as lead, asbestos and particulates, are released into the atmosphere. Still further, recycling building materials reduces pollution attendant on the manufacture of new building materials. *See id.* at A-2 (benefits of salvaging used building materials includes "[a]voided environmental impacts from manufacturing of new materials").

27. Second Chance, with the revenues it generates from cash donations by donees and the sales of salvaged construction items, provides job training and skill development for unemployed and underemployed workers, many of whom come from impoverished backgrounds, have been incarcerated, suffered from addictions, or otherwise lacked opportunities to develop marketable skills. Deconstructing residential and commercial structures under the supervision and with guidance and instruction from experienced construction professionals, these workers learn the construction trade through the deconstruction of commercial and residential structures. Further, the wages paid to the workforce trainees benefit the local economy and decrease the need for public assistance.

28. Third, Second Chance's salvaging of construction materials contributes to the preservation of architecturally and historically important items at the same time Second Chance is providing job training and protecting the environment by recycling used building materials.

29. Second Chance's tripartite charitable mission – recycling for environmental protection, workforce training for historically unemployed or underemployed persons and preservation of historically and aesthetically important items – comports with the United States Environmental Protection Agency's 2015 strategic plan, which included an emphasis on recycling and redeployment of building materials.

30. Second Chance's deconstruction work includes the careful removal of three basic categories of materials: (1) dimension lumber; (2) roofing materials, such as slate and metal roofs; and (3) finishes, including, for example, exterior trim, columns, gables, doors, and interior materials such as molding, trim, cabinets, banisters, kitchen fixtures, bathroom fixtures and lighting fixtures.

**IRS Conduct Creating Need for Declaratory Judgment**

**IRS Challenges to GDC Clients' Deconstruction Deductions**

31. This Complaint for Declaratory Judgment is necessary to obtain a judicial resolution of an actual, current and "substantial controversy, between parties having adverse legal interests, or sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Karl v. Rettig*, 687 F. Supp. 3d 695, 711 (E.D.Va. 2023) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).

32. This controversy results from the Defendants' conflicting, inconsistent, irreconcilable, arbitrary and capricious interpretations and applications of the Internal Revenue Code ("IRC") and related statutory and regulatory provisions, and the Defendants' now-routine policy, based on those interpretations and applications, of rejecting GDC's Cost-Less-Depreciation appraisals for its clients who donate to Second Chance as "unqualified" and, therefore, disallowing, in full, charitable donation deductions by taxpayers for whom GDC has provided appraisals of deconstructed materials donated to Second Chance.

33. Besides systematically disallowing in full the tax deductions based on charitable donations to Second Chance by taxpayers for whom GDC has provided appraisals valuing those donations, and demanding that those taxpayers pay the corresponding additional taxes, the IRS has, as alleged above, imposed $22,000 in penalties on Plaintiff Smith and disallowed charitable donation deductions, while seeking to impose penalties and interest charges, on the Plaintiffs' appraisal clients, alleging that the GDC appraisals supporting the deconstruction donation deductions are not "qualified" appraisals.

34. Lest there be any doubt about the arbitrariness of the IRS's approach – and revealing at least one impetus for that arbitrariness - one IRS field agent expressly stated, a number of

years ago, that the IRS was challenging every tax return filed by a Second Chance donor

in pursuing the IRS's goal of putting Second Chance out of business.  More recently, an

IRS agent told a Second Chance donor who is being audited that Second Chance and

GDC were receiving "a lot of IRS scrutiny despite past trouble and court cases," and that

Second Chance and GDC had not "changed their practices."  This selective targeting,

which directly affects GDC's business, further underscores the need for a Declaratory

Judgment.  *See generally In re Compass Marine Corp.*, 146 B.R. 138, 155 (Bankr. E.D.

Pa. 1992) (although finding employer ineligible for safe harbor for nonpayment of FUTA

and FICA taxes, stating "It is somewhat disturbing to us to observe the selective

enforcement of the IRC requirements for classification of employees…We were also

disturbed by the suggestion that [the investigating IRS agent] prides himself as somewhat

of a crusader on this issue.")

35. Because a number (limited by compliance with IRS independence- and objectivity-based

limitations on the percentage of business an appraiser can do for donors to one charity) of

GDC appraisal clients, such as the Audited Donors, donate to Second Chance, the IRS's

arbitrary and intensive enforcement focus on Second Chance, and audits of Second

Chance donors, materially and adversely affects GDC and Mr. Smith. Prospective clients

naturally inquire about the success rate of the Plaintiffs' clients with the IRS.  Having to

inform prospective clients that the IRS is regularly auditing the Plaintiffs' clients who

donate to Second Chance has, unsurprisingly, hurt the Plaintiffs' business.

36. Even the Plaintiffs' appraisal clients who are not planning to donate to Second Chance

are now more reluctant to do business with the Plaintiffs.  Prospective clients perform

due diligence.  So do their accountants, lawyers and tax professionals.  Prospective

clients and their professional advisors are understandably chary of hiring the Plaintiffs whose appraisals for Second Chance donors are now routinely audited by the IRS. Clients do not want to hire an appraiser who, rightly or wrongly, directly or indirectly, seems to have found itself in the IRS's audit crosshairs.

37. Further illustrative of the IRS's arbitrary choice of a "yea" or "nay" determination of a valuation appraisal based on the Cost-Less-Depreciation method, as noted above, except for a few occasions over many years, the IRS has not challenged GDC's Cost-Less-Depreciation appraisals for its clients who donate to charities other than Second Chance, including where such donations from deconstruction of commercial properties generate large charitable gift donations and correspondingly substantial tax deductions.

38. The IRS's selective, arbitrary and systematic rejections of GDC's appraisals as "unqualified" for GDC clients who donate deconstructed materials to Second Chance, as opposed to other qualified charitable organizations, has created substantial uncertainty for GDC in its appraisal methodology decisions and related business operations, wrongly confined the  independent, objective and professional judgment that qualified appraisers are required to apply,   and has had an immediate, direct and deleterious effect on the Plaintiff's ability to operate its business.

39. GDC approaches appraisals consistently with scrupulous attention to the IRS rules and regulations, using the same processes to determine and employ, objectively, the most appropriate appraisal method(s) for every particular charitable donation of deconstructed building materials.  GDC analyzes and determines the most appropriate appraisal method (s)for its clients who donate to Second Chance just as GDC does for its clients who donate to other charitable organizations.  The IRS almost always accepts GDC's

appraisals for the latter group, but is now systematically rejecting GDC's appraisals for the former group of clients.

40. As described more fully below, the Defendants consistently have been using the same boilerplate reasons to challenge as "unqualified" the GDC appraisals valuing its clients' charitable donations to Second Chance.

41. Since approximately 2022 the IRS has challenged the charitable donations of at least twenty-two (22) GDC appraisal clients (the "Audited Donors") who donated deconstructed materials to Second Chance, concluding, in every case, that GDC's appraisal, employing the Cost-Less-Depreciation method, was not a "qualified" appraisal.

42. Accordingly, the Plaintiffs need a judicial declaration that their appraisal process producing valuations on which taxpayers rely in supporting their charitable donations does - or does not - comply with all applicable laws and regulations, whether the client donates to Second Chance or to some other charitable entity. That way, if and to the extent the Court finds that GDC's appraisal methodology and related business practices are not fully or substantially compliant with the applicable laws and regulations, GDC can modify its appraisal practices accordingly.

## **This Complaint Satisfies the Requirements for a Declaratory Judgment**

43. This Complaint satisfies the "ripeness" component of the case or controversy requirement in the declaratory judgment context.

44. First as to "ripeness," the "'adversity of the parties' interests'" (*Karl*, 687 F. Supp. 3d at 711 (quoting *Plains All. Am. Pipeline L.P. v. Cook*, 866 F. 3d 534, 539-40 (3d Cir. 2017)) is clear. The IRS is routinely disallowing the charitable donations of the Plaintiff's appraisal clients who donate to Second Chance, claiming that the Plaintiff's appraisals are

based on an invalid use of the Cost-Less-Depreciation methodology and are not "qualified appraisals" as required for a qualifying charitable donation, resulting in damage to the Plaintiffs' business result.  Sharpening the immediacy of the adversity of the parties' interests, the IRS has imposed penalties on Mr. Smith for providing appraisals that, Plaintiffs allege, comply with all applicable IRS rules and regulations for "qualified appraisals."

45. The IRS's uniform rejection of the Plaintiffs' Cost-Less-Depreciation deconstruction appraisals for donors to Second Chance directly imperils the continued viability of the Plaintiff's business – donors perform due diligence, and understandably do not want to hire an appraiser whose work is routinely – if wrongly – rejected by the IRS.

46. Further, the IRS's rejection of Plaintiffs' appraisals, using the Cost-Less-Depreciation method, for donors to Second Chance improperly restricts the Plaintiff's ability to employ its informed and independent professional judgment in performing appraisals, contrary to the applicable statutes, rules and regulations recognizing the necessity of just such professional judgment and the propriety, depending on the circumstances, of at least three valid appraisal methods.

47. Second, as to "ripeness," "a declaratory judgment would conclusively end the dispute with respect to the narrow issue" of whether the Plaintiffs' appraisal methods do, or do not, comply with the applicable provisions and regulations of the Internal Revenue Code. *Karl*, 687 F. Supp. 3d at 711.

48. Third, as to "ripeness," "there would be utility in the issuance of a judgment.  'Practical utility goes to whether the parties' plans of actions are likely to be affected by a declaratory judgment…and considers the hardship to the parties of withheld consent."

*Karl*, 687 F. Supp. 3d at 711 (quoting *Plains*, 866 F. 3d at 543-44). A judicial declaration of the validity or invalidity of the IRS's contentions in finding that GDC's appraisals for Second Chance donors are not "qualified appraisals" will clearly, directly and immediately affect how the Plaintiff and the IRS go about their respective businesses. Withholding a declaratory judgment will leave the parties – most certainly the Plaintiffs, anyway - in a state of uncertainty, leave the Plaintiffs unsure about how to perform appraisals and conduct business, and result in numerous Tax Court proceedings and federal court taxpayer refund litigation that might well be obviated by the declaratory judgment the Plaintiffs seek.

49. Illustrating the "utility in the issuance of a judgment," the IRS has taken, and continues to take, starkly conflicting and confusion-causing approaches to deconstruction appraisals done by other appraisers, for donations to charitable organizations other than Second Chance. This has left deconstruction appraisers such as the Plaintiffs at a loss to understand exactly what is required for a deconstruction appraisal to be deemed qualified, other than that for donors to Second Chance, at least, an appraisal absolutely cannot employ the Cost-Less-Depreciation Method, even if that method is entirely justified by the facts and circumstances under the IRS's own rules and regulations.

50. For example, a charitable organization called "HARVEST Eco-Salvage" calls itself "[a] 501(c)(3) Non-Profit Corporation dedicated to Keeping Usable and Recyclable Building Materials Out of Our Landfills." *See* harvestecosalvage.org. Harvest Eco-Salvage claims, among other things, that, in 2024 alone, it has "Issued over $28 million in tax deductions to our donors," and, further, that "[s]ince 1999, We've: Cultivated an impeccable IRS standing…Disbursed hundreds of millions of dollars in Charitable Non-

Cash Donations." *See* harvestecosalvage.org.  HARVEST Eco-Salvage claims, on its

website: "As an environmental 501(c)(3) non-profit organization, we grant non-cash

charitable tax deductions.  We base these on the market value of in-place real estate

improvements that we salvage.  An IRS-qualified *real estate appraiser* determines this.

When you work with HARVEST Eco-Salvage, we value your materials based on what it

would cost to replace them today" (emphasis added). Still further, HARVEST Eco-

Salvage claims that supporting appraisals by a *real estate* appraiser, using the Cost-Less-

Depreciation or "replacement cost" method, are "IRS qualified."

51. On information and belief, Harvest Eco-Salvage does not even have a facility within

which to store or re-sell donated items.

52. Most relevantly for the Plaintiffs' claim for a Declaratory Judgment, HARVEST Eco-

Salvage publicly touts that it, not the IRS, "grant[s] non-cash charitable tax deductions,"

and does so on the basis of appraisals by a *real estate* appraiser – not a qualified personal

property appraiser - and, further, does so on the basis of the "replacement cost method"

(another term for the Cost-Less-Depreciation Method), which the IRS has been

categorically rejecting when employed by the Plaintiffs for appraisals for charitable

donations to Second Chance.

53. The arbitrariness and capriciousness of the IRS's apparent blessing of HARVEST Eco-

Salvage's approach, which relies on appraisals that do not, on information and belief,

meet the "qualified appraisal" requirements of IRS Regulation § 1.170A-13(c)(3), Notice

2006-96 and 2006-46 I.R.B., while categorically rejecting proper, qualified, highly

detailed personal property appraisals from the Plaintiffs for donors to Second Chance, is

clear and compels the issuance of a declaratory judgment.

54. The IRS's application of its myriads of rules and regulations to the Plaintiffs when donors to Second Chance are involved, as distinguished from the IRS's applications of those same rules and regulations to other appraisers and charitable organizations, is not merely a "difference of degree" but a "difference of kind."  The IRS is applying different rules to different appraisers and different charitable organizations, arbitrarily and capriciously.

## EXCEPTION TO DECLARATORY JUDGMENT ACT FOR "FEDERAL TAX" MATTERS, AND ANTI-INJUNCTION ACT, DO NOT PROHIBIT THIS COMPLAINT

55. This Complaint is not prohibited by the exception to the availability of the Declaratory Judgment Act "with respect to Federal taxes" (28 U.S.C. § 2201(a)).  Nor does the coterminous (although textually narrower) provision in the Anti-Injunction Act stating that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed" (26 U.S.C. §7421(a)) preclude this Complaint.  *See McKenzie-El v. Internal Revenue Service*, 2020 WL 902546, at * 9 (D. Md. Feb. 24, 2020) ("tax case" exception to availability of Declaratory Judgment relief is coextensive with Anti-Injunction Act's linguistically more limited prohibition of actions "for the purpose of restraining the assessment or collection of any tax" (citing *Cohen v. United States*, 650 F. 3d 717, 727  (D.C. Cir. 2011) (*en banc*), for proposition "that the Anti-Injunction Act and the Declaratory Judgment Act are 'coterminous'").

56. Further, neither the Declaratory Judgment Act nor the Anti-Injunction Act prohibit the Plaintiffs' request for declaratory relief, because those Acts only "apply 'when the *target* of a requested injunction is a tax obligation'" (*Faulk Co., Inc. v. Becerra*, 777 F. Supp. 3d 714, 725(N.D. Tex., 2025) (quoting *CIC Servs, LLC v. Internal Revenue*

*Serv.*, 593 U.S. 209, 218 (2021) (emphasis by *Faulk* court). In determining "the target of

the requested injunction, courts look at 'the relief requested,' or 'the thing sought to be

enjoined' in the complaint... When, as was the case in *CIC Services*, a party claims that

the enforcement of a tax is *procedurally* flawed, the target is not the tax penalty

itself." *Faulk,* 777 F.3d at 725(quoting *CIC Services*, 593 U.S. at 217, and citing *CIC*

*Services*, 593 U.S. at 218).  Finding that "Faulk's [complaint's] target is the process by

which the [employer shared responsibility payment, an "excise tax"] is assessed, and that

the requested relief "targets the proper statutory interpretation of the process required in

I.R.C. Sec. 4980H and ACA Sec. 411, not the tax itself," *Faulk* concluded "[t]herefore,

the Declaratory Judgment Act does not bar the requested relief."  *Faulk*, 777 F. Supp. 3d

at 725.

57. *Faulk* and *CIC Services* teach that the Declaratory Injunction Act and Anti-Injunction Act

do not preclude a federal court action seeking declaratory or injunctive relief concerning

the *process* by which a tax or a penalty is imposed on a Plaintiff.

58. Accordingly, as the Supreme Court's *CIC Services* ruling says, and as *Faulk* confirms in

applying the *CIC Services* ruling, neither the Declaratory Judgment Act nor the Anti-

Injunction Act prohibit the Plaintiffs' request for declaratory relief here.  Here the

Plaintiffs' Declaratory Judgment claims seek only a declaration about proper

interpretation and application of the legal requirements governing the process required

for the Plaintiffs' business of providing deconstruction donation appraisals business to be

legally compliant.  This Complaint does not challenge any taxes or penalties imposed on

the Plaintiffs at all, [2] or on the charitable donors to whom the Plaintiffs provide qualified appraisals for tax purposes. The Plaintiffs seek guidance, in the form of declaratory relief, for their business practices, and the IRS remains free to impose and collect taxes as the IRS sees fit.

59. As the facts alleged in this Complaint show, the Plaintiffs seek only a judicial declaration of the proper interpretation and application of relevant IRC statutes and regulations, for purposes of ensuring that the Plaintiffs' appraisal methodology and related business practices comply with all applicable statutes and regulations governing appraisals valuing charitable donations of deconstructed building materials, regardless of the identity of the charitable organization involved. Plaintiffs' case fundamentally involves a *process* issue, not a specific attack on the imposition of any particular tax or penalty.

60. The requested declaration imposes no actual or potential impediment to the IRS's ability to assess and collect taxes. The Plaintiffs do not seek to remove, limit or otherwise condition the IRS's ability to levy or collect taxes in any particular case involving the Plaintiffs or any other taxpayer. No taxpayer claims are at issue and no taxpayers are parties to the requested Declaratory Relief.

61. Rather, the Plaintiffs request the Court's resolution of the correct interpretation and application of statutes and regulations governing valuation appraisals in support of charitable donations of deconstructed building materials, the IRS's interpretation of

---

[2] Mr. Smith reserves his right to challenge in a separate proceeding the penalty assessed upon him upon full payment of the IRS-imposed $22,000 penalty on Mr. Smith for allegedly "aiding and abetting" underpayment of taxes by the Plaintiffs' clients who donated deconstructed materials to Second Chance. *See Flora v. United States.*, 362 U.S. 145, 177 (1960). *See also Barnes v. United States*, 2024 WL 1336569, at * 3 (U.S. Ct. Claims, Mar 28, 2024) (citing cases for proposition that *Flora* "full payment rule" requires full payment of assessed tax or penalty before party can sue for refund.

which has created a presently existing controversy.  Through such judicial resolution the

Plaintiffs can either ensure that their current appraisal methodology and related business

practices comply fully with all applicable statutory and regulatory requirements, or the

Plaintiffs will know how they must modify their current appraisal methodology to ensure

such compliance.  *See Lehman Bros. Bank, FSB v. Beverly Hills Estates Funding, Inc.*,

456 F. Supp. 2d 1211, 1215-16 (D. Utah 2006) ("it is 'well-settled that the exception for

federal taxes [in the Declaratory Judgment Act] does not bar actions by *non-taxpayers*

who seek neither to restrain the assessment of taxes nor to dispute the taxpayer's ultimate

tax liability'" (quoting *Sea-Land Service, Inc. v. United States*, 622 F. Supp. 769, 771 (D.

N. J. 1985)).

## DECLARATORY JUDGMENT IS WARRANTED HERE

62. "A declaratory judgment action is appropriate" here because "'there is a substantial

controversy between parties having adverse legal interests, of sufficient immediacy and

reality.'"  *Whiting-Turner Contracting Co. v. Express Servs., Inc.*, 2023 WL 2500270, at *

3 (D. Md. Mar. 14, 2023) (quoting *Ass'n of Am. Publishers, Inc. v. Frosh*, 607 F. Supp. 3d

614, 617 (D. Md. 2022) (further citation omitted).  In automatically concluding that the

Plaintiffs' appraisal methodology and associated business practices do not result in

"qualified appraisals" for donors to Second Chance, the IRS has generated the requisite

"substantial controversy" warranting a declaratory judgment.

63. In attacking the Plaintiffs' established appraisal practices in denying the charitable

donation deductions of the Plaintiffs' clients who donate to Second Chance, the IRS has

shown that the IRS and the Plaintiffs have the necessary "adverse legal interests."  This

clearly delineated and continuing controversy has the "sufficient immediacy and reality"

(*Whiting-Turner*, 2023 WL 2500270, at *3) that compels resolution through Declaratory Judgment.

64. Subject matter jurisdiction, alleged below, is necessary for the Court to issue the Declaratory Judgment the Plaintiff requests.  However, the Plaintiffs understand that the existence of subject matter jurisdiction, by itself, does not itself require the Court to exercise that jurisdiction in a declaratory judgment action.  Rather, the Court has discretion whether to exercise its subject matter jurisdiction to resolve a Declaratory Judgment action.  *See, e.g., Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 552 (6th Cir. 2008), citing *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494 (1942)).

65. Here, the Court would "not abuse its discretion" in exercising its subject matter jurisdiction and "adjudicating the declaratory judgment."  *Whiting-Turner*, 2023 WL 2500270, at * 4.  The IRS's systematic challenges to the Plaintiffs' appraisals in rejecting the charitable donation deductions of the Plaintiffs' clients who donate to Second Chance, unlike the Plaintiffs' clients who donate to other qualified charities, has had and continues to have an injurious effect on the Plaintiffs' business.  Many of the Plaintiffs' clients who donate to Second Chance have sought the Plaintiffs' guidance and assistance in responding to IRS challenges. The Plaintiffs have been forced to spend time, effort and money, including legal fees, in providing such guidance and assistance to the Audited Donors. Prospective clients are voicing concern about working with the Plaintiff, being naturally concerned that a charitable donation supported by a GDC appraisal will be disallowed if the client wants to donate to Second Chance.

66. Accordingly, the Court should exercise its jurisdiction and rule on the immediately pressing claims brought in this Declaratory Judgment Complaint.  *See Whiting-Turner*,

2023 WL 2500270, at * 4 ("the Fourth Circuit has held that a district court must have 'good reason' to decline to entertain a declaratory judgment action.'" (quoting *McNulty v. Casero*, 479 F. Supp. 3d 200, 209 (4th Cir. 2004)).

67. A declaratory Judgment is clearly warranted here because "declaratory relief would 'serve a useful purpose in clarifying and settling the legal relations in issue' and 'will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings.'" *Whiting-Turner*, 2023 WL 2500270, at * 4 (quoting *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F. 3d 581, 594 (4th Cir. 2004)).

68. The Plaintiffs are "in a position of uncertainty and insecurity" (*Whiting-Turner*, 2023 WL 2500270, at * 4) about whether their appraisal methodology and related business practices comply with all relevant statutes and regulations applicable to appraisals required to support charitable donations of deconstructed building materials. As alleged above, the IRS accepts deconstruction appraisals employing the Cost-Less-Depreciation from the Plaintiffs when the donee is an entity other than Second Chance, and, on information and belief, routinely accepts "replacement cost" valuations (another way of saying "Cost Less Depreciation") from HARVEST Eco-Salvage, but the IRS automatically rejects deconstruction appraisals based on the Cost-Less-Depreciation valuation method when the deconstructed materials are being donated to Second Chance.

69. Similarly, the Plaintiffs are in a position of uncertainty about whether the IRS is misapplying the governing deconstruction appraisal statutes and regulations, and, accordingly, whether the Plaintiffs can continue to use the Cost-Less-Depreciation appraisal methodology that is often required by the facts and circumstances of particular donation, had long been accepted by the IRS – and still is accepted by the IRS as long as

the donee organization is not Second Chance - or whether the Plaintiff must abandon or

change that methodology, a core component of its business, or even continue to operate.

## PARTIES

70. GDC is a d/b/a of its predecessor company, NoVaStar Appraisals, Inc., with a principal

place of business at 927 Maple Grove Dr., Suite 201, Fredericksburg, Virginia, and is a

citizen of Virginia for jurisdictional and revenue purposes.

71. Patrick M. Smith is an individual, a citizen of the State of Virginia, the President and

owner of GDC, with a residence at 6905 Lakeland Way, Fredericksburg, Virginia.

72. The Internal Revenue Service is an agency of the United States with its principal place of

business at 1111 Constitution Avenue, N.W., Washington, District of Columbia.

73. Pamela Jo Bondi is the Attorney General of the United States, and, to the extent the

requested declaratory relief implicates the constitutionality of any Act of Congress, is a

required party pursuant to 28 U.S.C § 2403, as implemented by Fed. R. Civ. P. 5.1.

74. The United States of America is a required party to the extent that federal statutes and

federal regulations are at issue in this lawsuit, and to the extent that the Attorney General,

Pamela Jo Bondi, is required to be a named party Defendant.

## JURISDICTION

75. Jurisdiction is proper in this Court under the federal question jurisdiction provision of 28

U.S.C. § 1331, because this case is a civil action arising under the laws of the United

States, in particular, the interpretation and application of federal statutes and regulations

by the IRS, a federal agency.

76. Jurisdiction also is proper in this Court under 28 U.S.C. § 1340, vesting original jurisdiction in the federal district courts of any civil actions arising under the internal revenue laws.

77. Jurisdiction also is proper in this Court under 28 U.S.C. §§1346(a)(1) and 1346(a)(2).

## VENUE

78. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because the IRS is the sole defendant and is a resident of this judicial district.

79. Venue also is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because this is a civil action against the IRS, an agency of the United States, and the IRS is a resident of this judicial district.

**80.** Venue also is proper in this judicial district under 28 U.S.C. § 2201(a) because this case presents an actual controversy within the Court's jurisdiction and the Plaintiffs are seeking a declaration from the Court as to the rights and legal relations of the parties in connection with federal income tax statutes and regulations.

## STANDING

### Constitutional Standing

81. The Plaintiffs have suffered the "'concrete *and* particularized'" injury, injury-in-fact, personal to them, that is required for constitutional standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334 (2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S.167, 180-81 (2000) (emphasis by *Spokeo* Court).

82. The Plaintiff has been compelled to spend substantial amounts of time and effort, devote the time and work of its principal, employees and attorneys, and incur substantial expenses to respond to inquiries and requests for assistance from its clients who are

facing IRS challenges to their charitable donation deductions based on the IRS's rejections of the Plaintiffs' appraisals as "unqualified."

83. Further confirming the concrete, particularized and personal injury-in-fact suffered by the Plaintiffs and the immediacy and adversity of interests of the Parties, and as described in more detail, below, the IRS imposed a $22,000 fine on Mr. Smith for allegedly "aiding and abetting" the IRS-claimed underpayment of taxes by the Audited Donors by providing the Audited Donors with Cost-Less-Depreciation appraisals on which the Audited Donors based their claimed tax deductions for charitable donations.

84. The Plaintiffs' injuries-in-fact are concrete,  particularized and personal to the Plaintiffs because the IRS's actions (i) have created great uncertainty for the Plaintiffs about what regulations and requirements the IRS will apply to the Plaintiffs' appraisals, and (ii)  have injured the Plaintiffs' business and pose a continuing direct threat to the Plaintiffs' business by rejecting the Plaintiffs' appraisal methodology, the core of its business model that the Plaintiffs successfully used for many years before the IRS's recent about-face. These injuries-in-fact are "'particularized'" because they "'affect the [P]laintiff[s] in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

85. The Plaintiffs' injuries are also "concrete," because they are "'*de facto*'" – that is, they "actually exist."  *Spokeo*, 578 U.S. at 340 (quoting Black's Law Dictionary 479 (9th ed. 2009).  In other words, they are "concrete" because they are "'real,' and not 'abstract.'" *Spokeo*, 578 U.S. at 340 (quoting Webster's Third International Dictionary 472 (1971), Random House Dictionary of the English Language 305 (1967)).

86. Prospective GDC appraisal clients perform due diligence, and discover that the IRS is challenging the charitable donation deductions claimed by virtually all of GDC's clients who donate to Second Chance.

87. Essentially, the IRS is telling the Plaintiffs' former and prospective clients that all charitable donations to Second Chance of deconstructed building materials and items supported by GDC appraisal valuations will be challenged and denied, with serious financial repercussions for those clients.

88. Apart from spending time, money, and effort in assisting its clients who donate to Second Chance and have been subjected to the IRS's corresponding systematic rejections of GDC's appraisals, the Plaintiffs have experienced business losses and sustained reputational damage from the IRS's repeated challenges to the charitable donation deductions of Second Chance donors for whom Plaintiffs performed the valuation appraisal.

89. The IRS's systematized attack on the charitable donations GDC appraisal clients who donate to Second Chance, coupled with the IRS's promise to continue challenging the tax returns of all such donors and clients, present and future, shows that the Plaintiffs' already-suffered injuries will continue to be incurred, are "certainly impending" and have a "substantial risk" of occurring.

90. Whether primary, or derivative of the IRS's avowed goal of putting Second Chance out of business, the IRS's "declaration of war" on GDC's appraisal methodology and related business practice confirms that the alleged harms here are not just hypothetical musings about a risk of possible future injury.  As long as the Plaintiffs remain in the business of providing appraisal valuations, using the same practices and procedures that for years

produced IRS-compliant and approved charitable deconstruction donations – and still do for non-Second Chance donors - the risk of continued future injury to the Plaintiffs is not just possible but virtually guaranteed.

91. In addition to the already-inflicted harm on the Plaintiffs by the IRS's systematic and reflexive challenges to GDC's appraisals for Second Chance donors, the virtually-certain-to-occur risk of future harm by continued such challenges satisfies the rule "that standing to bring a declaratory judgment claim may be premised on threatened rather than actual injury." *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgm't LLC*, 2021 WL 4993895, at * 7 (S.D. N.Y. Oct. 26, 2021) (citing *Spokeo* 578 U.S. at 341, for proposition that "a 'risk of real harm' can satisfy the [threatened harm] requirement").

92. The Plaintiffs' injuries-in-fact are "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citation omitted).   The IRS has been, is presently, and has promised to continue challenging GDC's appraisals valuing the charitable donation deductions taken by the Plaintiffs' clients who donate to Second Chance.  And the IRS has penalized Mr. Smith for the Plaintiffs' appraisals for the Audited Donors.  This state of affairs confirms the Plaintiffs' standing to seek a Declaratory Judgment.  *See generally, Andre P. Marshall, M.D., Inc. v. Squlpt Mgm't LLC*, 2025 WL 2025000, at * 3 (C.D. Cal. July 14, 2025) (in trademark infringement case; "plaintiff has standing if it demonstrates a real and reasonable apprehension that [it] will be subject to liability if [it] continues with [its] course of conduct'" (quoting *San Diego Cty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1023 (9th Cir. 2023)).

93. The Plaintiffs have suffered cognizable injuries-in-fact and have a direct, personal, immediate and urgent stake in the outcome of the declaratory judgment action, and not just a theoretical interest in a particular tax law issue.

94. The Plaintiffs' injury-in-fact is causally related and "fairly traceable" to the IRS conduct at issue in this Declaratory Judgment Complaint. *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560-61). The Plaintiffs' business depends centrally on its clients' belief and trust that the Plaintiffs' appraisal procedures will not provide the IRS with any legitimate reasons to challenge the clients' charitable deconstruction donations. But in mounting what amounts to a scorched earth assault on all taxpayers who used the Plaintiffs' appraisal services to value donations made to Second Chance and that were appraised using the Cost-Less-Depreciation method, the IRS has made itself the proximate cause, and a but-for cause, of the Plaintiffs' injury-in-fact.

95. The Plaintiffs' injury-in-fact "is likely to be redressed by a favorable judicial decision" in this Declaratory Judgment Action. *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560-61). A judicial declaration, for example, that the Cost-Less-Depreciation valuation method is a valid appraisal valuation methodology under all the relevant statutes and regulations and is not presumptively invalid, and that where there is no sufficiently robust and economically comparable market of goods substantially similar to deconstructed items at issue that the Plaintiffs appraised for a particular charitable donation, the Plaintiffs' use of the Cost-Less-Depreciation method of valuation is a valid and proper method of calculating the FMV of a charitable deconstruction donation, will greatly diminish, if not entirely eliminate, the Plaintiffs' concern that the IRS will routinely reject

their appraisal clients' charitable donation deductions because they rely on valuation appraisals from the Plaintiffs.

96. Even a judicial decision that endorses the IRS' behavior, and rejects the Plaintiffs' arguments, will redress the Plaintiff's injury, which, at bottom, is the profound uncertainty that the IRS's inconsistent application of its rules and regulations has created. One way or the other, a judicial ruling will be prescriptive and tell the Plaintiffs what they should and what they should not do in their business.

97. The "redressability" requirement of standing will be satisfied in any event by a judicial ruling. Whatever the Court might conclude about the validity of the Cost-Less-Depreciation valuation method, and the IRS's consistent rejection of that method when Plaintiffs use it for Second Chance donors, the ruling "will serve a useful purpose in clarifying and settling the legal relations in issue and will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F. 3d 581, 594 (4th Cir. 2004) (cleaned up and citation omitted).

98. The Plaintiffs have standing to seek a Declaratory Judgment because, as the facts alleged in this Complaint demonstrate, they are "entitled to a declaration of rights" about their ability to continue to use, in appropriate cases, the Cost-Less-Depreciation valuation method, a method the IRS expressly endorses, and the IRS's continued attack on the Plaintiffs' Cost-Less-Depreciation appraisals for Second Chance donors makes "substantially imminent" the "risk of infringement" on the Plaintiffs' right to use that appraisal methodology. *Arch Insurance Co. v. A3 Development, LLC*, 2025 WL 1504176, at * 6 (S.D. Fla. May 27, 2025) (citations omitted)).

99. The IRS's continuing and unrelenting attack on the Plaintiffs' clients who donate to
Second Chance and claim deductions based on the Plaintiffs' appraisals, in service of the
IRS's declared desire to put Second Chance out of business, demonstrates that the "risk
of infringement" on the Plaintiffs' right and ability to use the Cost-Less-Depreciation
valuation methodology is both continuing and "substantially imminent." *Arch Insurance*,
2025 WL 1504176, at * 6 (citations omitted). *See also Spokeo*, 578 U.S. at 341-342 ("risk
of real harm," or "material risk of harm" can, depending on circumstances, "satisfy the
requirement of concreteness" (citing *Clapper v. Amnesty Int'l* USA, 568 U.S. 398
(2013)). *See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (standing
can arise from "future injury…if the threatened injury is certainly impending, or there is a
substantial risk that the harm will occur").

100. The IRS has been categorically rejecting the Plaintiffs' Cost-Less-Depreciation appraisals
for Second Chance donors (apparently with the goal of making Second Chance close its
doors), imposed a monetary penalty on Plaintiff Smith for allegedly "aiding and abetting"
donors' tax underpayments by using the Cost-Less-Depreciation method, and in essence
banning the Plaintiffs' use of the Cost-Less-Depreciation valuation method for Second
Chance donors – a method the IRS's own documents, and statutory and case law says the
Plaintiffs have the right to use. This demonstrates standing for Declaratory Judgment
purposes. *See SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F. 3d 1372, 1381 (Fed. Cir.
2007) (patent case; defendant "[t]ook a position that puts the declaratory judgment
plaintiff in the position of either pursuing arguably illegal behavior or abandoning that
which he claims a right to do").

**Prudential Standing**

101. This Complaint also satisfies the requirements of prudential standing.

102. First, the harm the Plaintiffs allege is not a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  Rather, the Plaintiffs' injuries are the Plaintiffs' alone.  The IRS is systematically attacking GDC's business by rejecting as "not qualified" GDC's Cost-Less-Depreciation appraisals for Second Chance donors.

103. On information and belief, the IRS is not similarly attacking other appraisers who provide Cost-Less-Depreciation valuation appraisals for purposes of supporting charitable donations of deconstructed building materials.

104. Second, the Plaintiffs are "'assert[ing] [their] own legal rights and interests'" rather than those of "third parties."  *Bishop*, 575 F. 3d at 423 (quoting *Warth*, 422 U.S. at 499).  The Plaintiffs have a plain, vested and personal interest in a judicial declaration stating whether or not their appraisal valuation methodology complies with the applicable governing statutes and regulations that determine whether an appraisal is a "qualified appraisal" under the Internal Revenue Code, 26 CFR §1.170A-17, which is required for approval of a charitable donation tax deduction.

105. Third and finally, the Plaintiffs' harm from the IRS's selective attack on its appraisal methodology for Second Chance donors is "'within the zone of interests protected or regulated by the statutory provision[s]…invoked in the suit.'"  *Bishop*, 575 F. 3d at 423 (quoting *Warth*, 422 U.S. at 499).  In this Complaint the Plaintiffs specify the statutes and

regulations at issue, all of which apply to the Plaintiffs' appraisal practices that the IRS

has been systematically rejecting.

**<u>The Court Should Exercise its Discretion to Adjudicate this Complaint</u>**

106. As noted above, the Plaintiffs understand that the Court has discretion to decide whether

to entertain a request for declaratory relief. *See Global Tel\*Link Corp. v. Jacs Solutions*

*Inc.*, 708 F.Supp. 2d 784, 800-801 (E.D. Va. 2023) (citing*, inter alia*, 28 U.S.C. § 2201(a)

and *Pub. Serv. Comm'n v. Wycoff Co., Inc.*, 344 U.S. 237, 241 (1952)).

107. The Court should exercise its discretion to entertain this declaratory judgment action

because "declaratory relief 'will serve a useful purpose in clarifying and settling the legal

relations in issue' and 'will terminate and afford relief from the uncertainty, insecurity

and controversy giving rise to the proceeding.'" *Volvo Constr. Equip. N. Am., Inc. v. CLM*

*Equip. Co.*, 386 F. 3d 581, 594 (4th Cir. 2004) (quoting *Aetna Cas. & Sur. Co. v. Quarles*,

92 F. 2d 321, 325 (4th Cir. 1937)).

108. Further supporting the Court's exercise of its discretion to adjudicate this request for

declaratory relief, the Plaintiffs are not parties to the IRS controversies with the Plaintiffs'

appraisal clients who donate to Second Chance.  Those clients often desire to reach

settlements with the IRS, precluding full development and analysis of the issues

implicating GDC's appraisal practices.  GDC has no means of obtaining "'more effective

relief'" through "'another procedure.'" *Global Tel\*Link Corp.*, 708 F.Supp.2d at 801 (

(quoting E. Borchard, <u>Declaratory Judgments </u>303 (2d ed. 1941)).

## FACTS

### The Charitable Donation Process

109.  Because the IRS's challenges appear confined to GDC's appraisal clients who donate to Second Chance, with the donation valuations done under the Cost-Less-Depreciation method, the following general description of the charitable donation process focuses on Second Chance.

110.  Potential donors of deconstructed building materials come to a charitable donee organization, such as Second Chance, through a variety of routes, such as advertising, referrals by building contractors and recommendations from previous donors.

111.  When a potential donor comes to Second Chance, Second Chance discusses the deconstruction process with the donor, including, without limitation, the environmental benefits of avoiding landfilling of still useful building materials, the societal advantage of the workforce training provided to previously unemployed or underemployed persons, and the potential for the donor to obtain a tax deduction for a qualifying charitable donation.

112.  Sometimes, but not always, a donor will want to understand the range of potential tax benefits from a deconstruction donation before deciding to proceed with the donation. That, in turn, requires information about the potential value of the items anticipated to be included in the donation.

113.  Second Chance provides potential donors with a list of qualified appraisers with whom the donors can consult about the potential value of the items anticipated to be deconstructed and donated.

114. GDC is included on the list of qualified appraisers that Second Chance provides potential donors.  However, Second Chance, as it must, leaves the choice of the qualified appraiser to the donors, and the donors do their own due diligence – often including, as far as possible, the appraisers' track record with the IRS - in deciding which qualified appraiser to retain.

115. When a potential donor – or a donor who has already executed a charitable donation contract with Second Chance – comes to GDC to obtain a qualified appraisal, GDC takes a number of steps.  First, GDC executes an appraisal contract with the donor.  Second, GDC sends personnel to the site to do a preliminary initial inspection of the structure to be deconstructed, to evaluate the condition of the structure and its components, and to take photographs and catalogue all of the materials, still *in situ*, that will or may be included in the charitable donation once deconstruction is underway.  Third, GDC performs a *preliminary* appraisal valuation, an estimate of the potential value of the deconstructed items, so the donor will have some understanding of the potential tax benefits to the donor of the deconstruction donation.

116. GDC's preliminary appraisal is designed to generate, as accurately as possible, the fair market value ("FMV") of the items anticipated to be included in the donation. That is because FMV is the "touchstone" (*Wells' Estate v. Commissioner*, 50 T.C. 871, 878 (1968) for a proper calculation of the value of the donation for tax deductibility purposes. FMV, in turn, is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts."  Treasury Reg. § 1.170A-1(c)(2).

117. FMV has geographic and temporal components, as Treasury Reg. § 1.170A-1(c)(2)

reflects:

> If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property *in the usual market in which he customarily sells*, at the time and place of the contribution…The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, but if he sells only at retail the usual market consists of his retail customers.

118. The IRS's regulations recognize at least three different methods for determining the FMV

of donated property: "the income approach, the market-data approach [i.e., specific

comparable sales transactions], and the Replacement-Cost-Less-Depreciation approach."

Treasury Reg. § 1.170A-13(c)(3)(ii)(J).

119. Determining an FMV for donated used building materials is a case-by-case, fact-

dependent exercise that requires training, experience, and judgment.  In some cases, one

valuation method will be more appropriate than others to produce the most accurate FMV

possible.  In other cases, using a combination of valuation methods might be appropriate,

such as, for example, where one component of the donated items is best measured by the

income approach and the remaining components are not suited to the income approach

and require application of either the "Cost-Less-Depreciation" approach or the

"comparable sales" approach.

120. While the "comparable sales" approach can be "the best determinant of value," the

"Comparable Sales method is preferable only "[w]here comparable properties are

present." *Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 326 (2013).  *See also*

*Gardner v. Commissioner*, T.C. Memo. 2017-165, 2017 WL 3670197, at * 8 (charitable

contribution of hunting specimens; "As with any other valuation exercise, if an active market exists, we generally rely on comparable sales.").

121. The "comparable sales" or "market data" approach seems, at a first and uncritical glance, to have an appealing simplicity that, in turn, appears to augur accuracy in computing FMV. However, the "comparable sales" method is fraught with its own uncertainties and arbitrariness in many cases. For example, prices for certain used goods – such as used bathroom and lighting fixtures, granite countertops, and dimension lumber – in one geographic market, with one set of prevailing regulatory and economic conditions – average household income, inflation, supply and demand forces and other economic drivers - both locally and nationally, at one time, might very well differ tremendously from what the prices for such items would be in a geographically different market, at a different time, under different local and national regulatory and economic conditions. *See, e.g., Johnson v. Commissioner.*, T.C. Memo. 2020-79, 2020 WL 3046311, at * 13 (rejecting proposed comparables from each of two experts, finding "Both experts' post encumbrance direct comparable sales analyses suffer from a lack of suitable comparables. Specifically, all of Mr. Nash's comparables and all but one of Mr. Butler's encumbered comparables were in different markets throughout Colorado far from the ranch."). *See also* Department of the Army, Public Works Technical Bulletin No. PWTB 200-1-26, April 30, 2005, at A-10 (Salvage values fluctuate frequently and may vary significantly based on various economic factors. Whether a waste may or may not be cost-effectively recycled depends on local market conditions. Some areas may not have a market for certain materials….").

122.    In another example, used dimension lumber might fetch a far higher price in Hawaii
(where building materials costs are higher due to transport costs) than it would in
Vermont.  Used bathroom fixtures might command a much higher price in a location
where the supply chain is weak to non-existent, and a much lower price in a location
where the used building materials market is robust.  To put it colloquially, that a used 2-
by-4 fetches $1.00 in Baltimore, Maryland today cannot be confidently stated as a basis
for concluding that the same 2-by-4 would fetch $1.00 in Los Angeles, California today,
absent a showing of the fundamentally substantial similarity of the economic markets in
Baltimore and Los Angeles.  *See Bay Point Capital Partners, II, LP v. Thomas Switch
Holding, LLC*, 2023 WL 3294874, at * 7 (N.D. Ga March 31, 2023) (bankruptcy case
issue of proper method of determining value of collateral, discussing various valuation
methods: "sales-comparison approach 'values a property using data from recent sales
and/or listings of comparable properties in the market,'" but sales-comparison method "'is
disfavored for unique assets for which comparable sales are limited or do not exist'…By
contrast, the cost approach is generally used to value assets 'where there is a lack of
reliable comparable market sales.'" (citations omitted)).  *See also* Department of the
Army, Public Works Technical Bulletin No. PWTB 200-1-26, April 30, 2005, atA-17
(listing "several factors" that "drive the supply, demand and pricing for recovered
materials," including: (1) "Export markets;" (2) "Virgin Capacities and Recycled
Capacities;" (3) "Geography;" (4) "Transportation Costs;" (5) "End Product Demand" and
(6) "Natural Disasters Around the World."

123.    Supporting the use of the empirically grounded, analytically straightforward and
transparent Cost-Less-Depreciation method of appraisals of FMV for tax purposes, a

number of studies reflect the deeply localized and multi-factorial nature, on both the macro- (geographic, demographic and overall economic factors) and micro- (supply-and-demand factors, transportation costs, local preferences for design in particular market) levels of the market for deconstructed materials. These independent and unbiased studies, encompassing representative samples encompassing many years, demonstrate that, at bottom, the universe of actually "comparable sales" is, in many cases, thin, speculative and dependent on an appraiser's arbitrary and non-empirical assumptions and unstated "adjustments."

124. One study demonstrating the non-uniformity, location and time-specific nature, of the market for deconstructed building materials is by the U.S. Environmental Protection Agency, Office of Resource Conservation and Recovery, Construction and Demolition (C&D) Materials Scoping Study: Building Materials Reuse Centers (October 2012), at 1 ("C & D materials reuse is a decentralized industry...essentially a cottage industry"); at 2 ("obvious that only a small share of the total C & D waste stream is currently being reused"); at 5 ("many reuse centers and stores simply take in donated materials and sell them without ever recording the type, amount, or value of these items"); at 12 - 13 ("Another factor that would need to be addressed is price uniformity across the nation…When asked about geographical price variation Mr. Majercak responded that, in his experience, prices for run-of-the-mill items seems to be fairly uniform within a region. He was unable to comment on price variations across the country though. Drastic regional price variations could affect space to revenue rates…Another aspect of price differences is that item prices can vary widely depending upon quality of product, rarity or other characteristics.").

125. Another analysis demonstrating the fractious and idiosyncratic market for used building materials is the U.S. Dep't. of the Army, U.S. Army Corps of Engineers, Public Works Technical Bulletin PWTB 200-1-26, <u>Market Valuation of Demolition Salvage Materials</u>, Apr. 30, 2005, at A-10 ("Salvage values fluctuate frequently and may vary significantly based on various economic factors. Whether a waste may or may not be cost-effectively recycled depends on *local* market conditions. Some areas may not have a market for certain materials…."); at A-14 ("It cannot be overemphasized; researching *local* markets can make the difference between a demolition with a successful salvage operation that offsets project costs, and a [sic] unprofitable, costly demolition that stockpiles unwanted materials that cannot be sold for a profit."); at A-17 ("While there are substantial markets for salvaged concrete, metal, and high quality wood, other markets are weak for materials such as drywall, carpet, and mixed-composite materials."); at A-21 -A-22 (identifying fifteen (15) questions, reflecting market fragmentation, "to ask during a market survey") (emphasis added).

126. Yet another analysis showing that the "comparable sales" required for the "Comparable Sales Method" are, in truth, hard to come by is by Maia Research, <u>United States Used Building Materials Industry Market Research Report</u>, with data through the present. *See id.* at 2 ("The Used Building Materials industry concentration is low."); at 16 ("The recycling of used building materials is also subject to geographical restrictions. The distribution of building demolition and renovation projects is uneven. A certain region may have a large number of demolition projects concentrated in a certain period, generating a large amount of used materials, but these materials may not be transported to other regions in need in a timely manner. Transportation costs and logistics efficiency

have become important factors restricting the cross-regional circulation…This makes it difficult to effectively match the supply and demand of used building materials in different regions, resulting in oversupply in some areas and shortages in others."); at 24 ("In areas where economic development is relatively lagging or population outflow is large, such as some agricultural states in the Midwest, there are relatively few construction activities and the sources of used building materials are relatively limited. Moreover, due to the weak local market demand, the sales of used building materials may face difficulties and the industry is subject to certain restrictions.  However, there may be some special traditional building materials in these areas.  In cultural protection and special building projects, these second-hand materials may have *unique value* and can find markets in *specific areas.*"); at 24 ("In areas with different policies and regulations, some states or regions have strict policy requirements on building energy conservation and environmental protection, which may prompt builders to choose more new building materials that meet the standards, which has a certain inhibitory effect on the used building materials industry….In some areas, with relatively loose policies, the operating costs of the used building materials industry may be relatively low, but it may also face problems such as irregular market order.").

127. Just as one could not safely say that the sales price of a well-built, four (4) bedroom, three (3) bathroom Cape Cod-style house, on one (1) acre in Bethesda, Maryland is a proper price comparison for value of a similar house in the hinterlands of North Dakota, absent a myriad of empirically supportable assumptions, one cannot safely say that the price of dimension lumber and other salvaged deconstructed materials from a structure in

Bethesda, Maryland is a fair comparator for the price of such lumber and materials on the second-hand market in North Dakota.

128. Despite its superficial appeal as being a comparison of "apples-to-apples," the Comparable Sales valuation method in many cases would provide a comparison of "apples-to-bicycles."  The multitude of different economic and regulatory conditions, and other market conditions, in different markets at different times make price comparisons far from simple and reliable in many cases.  Homeowners and builders in one market in the country might be more willing – and legally permitted - to use recycled building materials than homeowners and builders in another geographic region, with differing impacts on the market price of such materials.

129. Using search parameters for comparable sales across the United States necessarily requires an appraiser to consider and make numerous location-specific adjustments that themselves are, to at least some extent, inherently subjective, with the resulting appraisal being conditioned by numerous "extraordinary assumptions" – which are used when the information available to the appraiser is uncertain and cannot be accurately or fully verified - that dilute the validity of the appraisal value conclusion.

130. Economic conditions applying to, local design preferences, and environmental, health and safety regulations governing, the use of recycled building materials are not uniform across the country, and differ not just by region but by municipality, town and village. Using the "comparable sales" valuation methodology, without any demonstration of the necessary similarity in prevailing market conditions in different geographic locations, or making any overt, fact-based adjustments for the wide variances in those conditions,

renders, in many cases, the "comparable sales" method not just imperfect but entirely unreliable.

131.  GDC employs the IRS-approved valuation methodologies in light of the facts and circumstances of each appraisal, choosing whichever method or combination of valuation methods appear, in light of all the relevant facts and circumstances, most likely to produce the most accurate FMV.  Applying serious scrutiny, based on long experience and the irrefutable truth that the market for used building materials is both thin and location-specific, GDC often is compelled, in seeking to establish the most accurate FMV of donated property, to eschew the Comparable Sales valuation method in favor of the deterministically sound Cost-Less-Depreciation method in  determining which appraisal method, or combination of appraisal methods, is most appropriate in a given case.

132.  GDC first seeks to determine whether an active and sufficiently robust – and properly comparable - market exists for the materials to be donated.  This determination is multi-factorial, requiring an assessment not only of the materials and the existence of an active market for them, but whether the requisite "active market" – the source of comparable prices for determining FMV - is contemporaneous with the anticipated donation, and is subject to the same or substantially similar economic conditions that affect pricing of recycled building materials in the market in which the donation will take place.  As stated above, that an active market in recycled dimension lumber existed on a date in the past in Los Angeles, California does not mean that market provides sufficiently comparable prices for determining the FMV today of donated dimension lumber in Baltimore, Maryland.

133. In cases in which GDC determines that the "Cost-Less-Depreciation" method is the most appropriate valuation method to use, GDC uses the R.S. Means software to implement that method. R.S. Means is a highly regarded company that provides an industry-leading construction cost database, updated quarterly, to ensure that cost estimates are as accurate as possible. *See Dubois Country Club, LTD v. Depositors Ins. Co.*, 2023 WL 6605660, at * 14, * 30 (W.D. Pa. Oct. 10, 2023) describing "R.S. Means" as "an industry standard" in case involving estimated reconstruction cost of country club). *See also Karpel v. Knauf Gips KG*, 2022 WL 16635584, at * 8, n. 6 (S.D. Fla. Nov. 2, 2022) (" 'RS Means is a cost estimator that accounts for regional differences in labor and materials costs by using zip codes to factor in the specific costs of nearly any type of construction in a particular area of the country'…It is 'a long-accepted tool for construction cost calculation, and its use as the starting point for calculating damages is widespread and accepted.'" (citations omitted)).

134. The IRS itself recognizes the utility and validity of the R. S. Means cost-estimating system. *See* https://www.irs.gov.pub.irs-procure (TIRSE-15-R-00002, Technical Exhibit TE-8, Glossary of Terminology) (describing R.S. Means as "[a] job estimating system commonly used by the construction industry developed by R.S. Means Company, Inc., which is also used by the Government for estimating cost and data for all phases of construction, maintenance, and repair cost determination.").

135. Calling R.S. Means "a reliable published source," the IRS endorses the use of the R.S. Means data in preparing '[c]ost segregation studies…for…income tax" reasons. *See* IRS "Cost Segregation Audit Technique Guide."

136. In using R.S. Means for their appraisals, the Plaintiffs are using a methodology to determine FMV for tax purposes that not only has been approved by case law, but also by an IRS publication.  The Plaintiffs use, as appropriate, the R.S. Means program in addressing the same appraisal issue that the IRS addresses and sees to resolve in Chapter 3 of the IRS's "Cost Segregation Audit Technique Guide" – namely, how an appraiser should determine the FMV of items for tax purposes.

137. GDC's preliminary appraisal does not include "consumables," such as floor tiles, drywall, asphalt shingles, bathroom tiles, and other construction materials that will or are likely to be "consumed" or otherwise damaged during the deconstruction process, in accordance with the rule established in *Mann v. United States*, 984 F. 3d 317, 323 -327 (4th Cir. 2021)).

138. If a donor decides to proceed with a charitable donation of deconstructed building materials rather than sending such materials to a landfill, Second Chance and the donor enter a charitable donation contract.  Among other provisions, that contract transfers to Second Chance – as of the date of the contract - all of the donor's right, title and interest in the structural materials and physical items being donated, constructively severing those materials and items from the underlying real estate. Typically, the contract provides not only for the donation of a building or residence for deconstruction by Second Chance, with Second Chance determining which of the structural materials can be and are salvaged and the donor only seeking a deduction for those actually-salvaged materials, but also provides for a cash donation to Second Chance by the donor to help fund the administration of the charitable donation of the building or residence, as approved by the Court in *Mann v. United States*, 364 F. Supp. 3d 553, 567-68 (D. Md. 2019).

139. Although GDC's appraisal clients hope to obtain a tax benefit from making a charitable donation of deconstructed materials, GDC's and Second Chance's contracts with donors expressly disclaim the giving of any tax advice, and expressly confirm that the donors are relying on the donors' own tax professionals, accountants and legal counsel for all tax matters.

140. With the charitable donation contract executed between the donor and Second Chance, and the donor having executed its separate appraisal contract with GDC, Second Chance proceeds to the deconstruction phase of the project.

141. The beginning date and duration of the deconstruction process depends on a number of factors, including the time required to assemble the appropriate workforce, the scheduling and status of other deconstruction projects, the size and complexity of the structure, and other site-specific concerns.

142. Second Chance's workforce takes care in the deconstruction process to permit harvesting of the greatest number of reusable materials as possible and in the best condition possible.  The more materials, and the better their condition, the easier it will be for Second Chance to sell the recycled materials to its customers, and the greater the value of the potential donation deduction for the donor.  In addition, using care and taking time in the deconstruction allows the Second Chance site supervisors to instruct the workforce trainees about the construction techniques used in building the structure.

**Process to Confirm Items Actually Donated**

143. As materials are removed from the structure being deconstructed, they are listed on documents and kept on site until a sufficiently large volume of such materials has been gathered to warrant transport to Second Chance's facility for resale.  Typically – but not

always, because the process is truly site- and situation-specific - this involves a number of trips, fewer for a small house, more for a large house, and still more for a commercial structure.

144. Sometimes, as deconstructed materials are collected on-site before being transported to Second Chance's warehouse, a neighbor, a contractor or another third party will see the materials and offer to purchase some items then and there, before the materials are taken to Second Chance's warehouse. These on-site transactions are, however, relatively rare, and comprise a very small percentage of Second Chance's sales.

145. When deconstructed materials are loaded onto trucks for delivery to Second Chance's warehouse, the type and quantity of material is listed on truck manifests.

146. Upon delivery of the deconstructed materials to Second Chance's warehouse, Second Chance and GDC engage in a process to confirm the quantity and condition of the donated materials so that GDC can produce a final appraisal valuing the donated materials. Accordingly, the truck manifests are not the only evidence of the deconstructed materials that are ultimately donated to Second Chance.

147. When the donated materials arrive at Second Chance's warehouse, Second Chance reviews the materials listed on the manifest as those materials are unloaded from the truck.

148. Second Chance also cross checks the actually received donated items against GDC's previously provided list of items potentially subject to deconstruction and donation. Items identified on that preliminary list that are *not* delivered to Second Chance's warehouse are then either confirmed as having been sold to a third party after deconstruction but before transport to Second Chance's warehouse, or as otherwise

having been consumed in the deconstruction process or for some other reason not having been actually delivered to Second Chance.

149. Through the cross-checking process described above, which often entails phone calls and emails between Second Chance and GDC, the preliminary list of potentially deconstructed and donated items by GDC is adjusted, as and when necessary, to reflect the on-the-ground operational realities of the deconstruction, to ensure, as far as possible, that only materials actually deconstructed and donated to Second Chance are included in the final appraisal and its attendant valuation of the FMV of the donated materials.

150. The donation documents and actual deconstruction process ensure that the donors grant all right, title and interest in all of the salvaged items to Second Chance – no "partial interests" are granted or even remotely involved. But Second Chance ultimately salvages only certain components of the deconstructed structures, and the donors claim charitable tax deductions, only for those components in which the donor's hold all legal and equitable right, title and interest.

151. The cross-checking process described above is designed to ensure, as far as reasonably possible, that items included in GDC's preliminary appraisal were, in fact, donated to Second Chance as part of a charitable gift.  This process is aimed to ensure that if Second Chance did not receive certain items (because, for example, they were destroyed in the deconstruction process), such items are not included in the FMV of the donee's appraisal of donated items.

**IRS's Contentions and Challenges to Charitable Donations**

**Automatic Rejections of GDC Appraisals as "Not Qualified"**

152. Citing  IRC § 170(f)(11)(A), the IRS has routinely claimed that GDC's Cost-Less-Depreciation appraisals for Second Chance donors are not  "qualified appraisals" supporting the donation, as required by IRC § 170(f)(11)(C), the Deficit Reduction Act ("DEFRA") § 155A, Treasury Regulations §§ 1.170A-13(c)(3)(ii)(A), 1.170A-17(a)(3)(iii) and *Mann v. United States*, 364 F. Supp. 3d 553 (2019), *aff'd*, 984 F. 3d 317 (4th Cir. 2021).

153. Relying for its challenges on "Technical Reviews" or "desk reviews" of Keith S. Brazier, who appears to be a commercial and residential real estate appraiser, [3] not an experienced personal property appraiser of charitable donations, the IRS has routinely challenged GDC's appraisals as not being "qualified" on a number of different grounds.

154. None of Mr. Brazier's "technical reviews" or "desk reviews" appear to involve anything other than Mr. Brazier's review of the donor's tax documents and the supporting appraisal document, with no physical inspections of the donated materials, no analyses of the availability and validity of alternative FMV methodologies in any particular case, no comparisons of the FMVs generated by use of the different IRS-approved valuation methodologies in any particular case, and no attention to the individual facts and circumstances of any particular charitable donation.

---

[3] *See* linkedin.com/in/keith-s-brazier-csag-217b6916 (last visited September 10) ("About – New York State Certified General-Commercial and Residential Real Estate Appraiser; CSAG – Designated Commercial Appraiser – Columbia Society of Real Estate Appraisers; Certified Conservation Easement Appraiser – Appraisal Institute; Certified Historic Preservation Appraiser – Appraisal Institute; 203K HUD Consultant").

155. <u>First</u>, the IRS has claimed that where the date of the GDC appraisal is consistent with the date of GDC's client's charitable donation contract with Second Chance, but the deconstruction and delivery of the ultimately donated items did not occur until a later date – even if in the same tax year - GDC's appraisal fails accurately to reflect the donation date. The IRS maintains that the correct donation date is the date Second Chance took the donated items into Second Chance's warehouse, not the date on which GDC's client and Second Chance's donor contractually granted all right, title and interest in its physical structure and elements to Second Chance.

156. <u>Second</u>, the IRS has claimed that the GDC appraisals supporting its clients' charitable donations to Second Chance do not contain the required description of the donated property. This, despite the descriptions of the property contained in the R.S. Means software that the Plaintiffs use, is because, the IRS asserts, the preliminary list – which, as described above, is later modified in an iterative cross-checking process - is performed *in situ*, before the actual deconstruction and removal of the property, and therefore reflects items as donated that were either destroyed in the deconstruction process or otherwise did not ultimately cross the threshold of Second Chance's warehouse.

157. <u>Third</u>, the IRS has asserted that GDC's appraisals are not "qualified appraisals" because they do not provide an adequate description of the physical condition of the donated items in their deconstructed state. Essentially, the IRS appears to contend that each and every donated item in each category of deconstructed materials – dimension lumber, windows, sinks, toilets, mantels, pediments, entablatures, light fixtures, trusses, doors, woodwork trim and so on through the lengthy catalogue of construction materials – must be individually inspected, graded and assigned a condition after it has been deconstructed

in order to qualify as a valid donation for tax deductibility.    However, the Plaintiffs justifiably rely on the donee organization's review, after deconstruction, of the Plaintiffs' preliminary list of potentially deconstructed and donated items.

158.  Fourth, despite the IRS's own recognition of R.S. Means as a "reliable published source" for establishing valuations for income tax purposes (*see* IRS Cost Segregation Audit Technique Guide, Feb. 6, 2025), the IRS has routinely concluded, in reliance on Mr. Brazier's "technical reviews" or "desk reviews," that GDC's use of the R.S. Means method, a "Cost-Less-Depreciation" method, to value certain items being donated to Second Chance is a categorically invalid method for determining the FMV of deconstructed building materials, fixtures and appliances for charitable donation purposes.

159.  Fifth, one of the IRS's consistently claimed bases for denying the charitable donation deductions of the Audited Donors is that the deduction claimed was based on the value of the "entire structure" that was deconstructed.  That is wrong.  The deductions were claimed, as an examination of the appraisals themselves shows, only on the materials that were severed from the realty, actually deconstructed and salvaged, and of which Second Chance took possession.  No "consumables" – items destroyed or otherwise unsalvageable as a result of the deconstruction process – are included in the Plaintiffs' appraised list of donated items.

160.  Sixth, on information and belief, all of the Audited Donors supported their claimed charitable donation deductions with substantial supporting documentation, including, without limitation, appraisal contracts with GDC, GDC's highly detailed and voluminous appraisals that include photographs of all of the relevant donated items, donation

contracts with Second Chance, Second Chance's documentation reflecting receipt of the actually salvaged materials of which Second Chance took possession and other donation-supporting documents, records and communications.

161. <u>Seventh</u>, the IRS has rejected the charitable donation deductions of the Audited Donors on the grounds that the donations were not recorded in the appropriate Registry of Deeds or otherwise in some other governmental repository of land records. But recordation of *personalty,* which are fixtures and personal property, severed from the land, are *not* subject to any recording requirements – not that any recording options exist for items such as "two doors, seventeen lamps, and fifty two-by-fours." The items the Audited Donors donated to Second Chance are not *realty.* Rather, they are *personalty.* And that personalty is not subject to any recordation requirement. *See Bohle v. Thompson*, 78 Md. App. 614, 626 (1989) ("a person who owns both realty and fixtures upon the realty may effect a constructive severance of the fixtures as personalty in a sales agreement); *Walker v. Schindel*, 58 Md. 360, 368 (1882) (an "express agreement" – such as those the Audited Donors had with Second Chance – "that the articles, or fixtures, so annexed" to real property, "should remain the property of the party by whom they were purchased and placed in the building, there can be no doubt or question that the agreement is valid, and that the articles will be treated as personalty"); *W. Maryland Dairy, Inc. v. Maryland Wrecking & Equip. Co,* 146 Md. 318, 318 (1924) ("a person who owns both realty and fixtures upon the realty may effect a constructive severance of the fixtures as personalty in a sales agreement").

162. Further demonstrating the error of the IRS's contention that "recordation" of the donated materials is required, no Maryland statute, regulation, ordinance or other legal

requirement supports that contention. Maryland law does not require the recordation of severed personalty such as the donated items. Such personalty is just that – "personal" – and not "real property." *See* Md. Code, Maryland Real Property Article, §§1-101(k), 3-301 (requiring transfers of "real property or any interest appurtenant thereto" and not of severed personalty).

163. Nor does the decision in *Mann v. United States*, 984 F.3d 317 (4th Cir. 2021), on which the IRS routinely relies for its "recordation" requirement, require the recordation of severed personalty. *Mann* involved a donor's claimed deduction for all of the improvements to real property. In contrast, the Audited Donors claimed deductions only for personalty that was severed from the realty, deconstructed, salvaged and of which Second Chance took possession. Illustrating the legally uncertain status of the IRS's purported "recordation requirement" for severed personalty, Maryland's Montgomery County Land Records Office has no process in place by which severed personalty could be recorded.

164. Similarly, the IRS relies for its "recordation" requirement on *Platts v. Commissioner*, T.C. Memo. 2018-31, 115 T.C.M. (CCH) 1132. But *Platts* involved a claimed donation of "an intact house" – not a claimed donation, such as that of the Audited Donors, of severed personalty. Dispositively different from the appraisals relied upon by the Audited Donors, the *Platts* appraisal valued "the donated property as a standing dwelling rather than building parts."

165. Eighth, the IRS attacks the Audited Donors' charitable donation deductions by arguing that the supporting appraisals did not contain a sufficient identification, and physical description of the donated personalty. That is wrong. Every one of the appraisals

provides a specific identification and description of the condition of the donated property. In some cases, for some items, the description is "Good." In other cases, as to other items, the description is "Average" or "Average-Good." Further, the descriptions provided are supported with many photographs of all of the donated items. The appraisals give the IRS all the information the IRS needs, and that the IRS's own regulations require, about the "description of the donated property."

166.    Ninth, the IRS has routinely argued that the Audited Donors failed to meet the requirement of providing contemporaneous written acknowledgments. But from the facts available to the Plaintiffs, and on information and belief, the Audited Donors supplied, in most if not all cases, four different such acknowledgments. First, a "same-day" letter from Second Chance confirming Second Chance's receipt of the donation. Second, a signed and dated pledge agreement by the Audited Donor. Third, a receipt reflecting the donation, listing the actually salvaged and donated materials, executed by Second Chance, and attached to the final version of the appraisal. Fourth, a "thank-you" letter from Second Chance that includes the date of donation. These acknowledgments include all information required by the regulations governing non-cash charitable donations, describe the donated property, and state that the Audited Donors received no goods or services in exchange for the donation.

167.    As the foregoing nine allegations demonstrate, the IRS has been pulling out all the stops in its declared mission of shutting down Second Chance, with concomitant attacks on GDC's appraisals, necessitating the Plaintiffs' request for a Declaratory Judgment.

## LEGAL CLAIMS

### Count I: Declaratory Judgment that the IRS's Challenges to the Plaintiff's Business Practices Cannot be Validly Based on the Analyses of Keith S. Brazier

168.  The Plaintiffs reallege, and incorporate by reference as if they were set forth in full herein, the allegations contained all of the foregoing paragraphs of this Complaint.

169.  The IRS has attacked GDC's appraisal methodology and associated business practices for Second Chance donors, based on evaluations that amount to an "unqualified appraisal template" and are styled as "Technical Reviews" or "desk reviews," by "Keith S. Brazier, Appraiser."

170.  Web-based research shows that Mr. Brazier is a commercial and residential real estate appraiser, *not* an experienced personal property appraiser of charitable donations of used building materials and related house-fixtures and appliances.

171.  The foundational charitable deduction statute, 26 U.S.C. § 170(f)(11)(C), requires that for charitable donations "for which a deduction of more than $5,000 is claimed," the taxpayer must attach to her tax return a "qualified appraisal."

172.  26 U.S.C. § 170(f)(11)(E)(i)(II) defines a "qualified appraisal" as an appraisal "conducted by a qualified appraiser."

173.  26 U.S.C. § 170(f)(11)(E)(ii)(I)-(III) specifies three requirements for an appraiser to qualify as a "qualified appraiser." Summarizing, these are: holding an "appraisal designation from a recognized professional appraiser organization" or otherwise meeting "minimum education and experience requirements" established by the Secretary; "regularly perform[ing] appraisals" for "compensation;" and "meet[ing] such other requirements" imposed by the Secretary.

174. However, satisfaction of the three requirements of 26 U.S.C. § 170(f)(11)(E)(ii)(I)-(III) does not guarantee that an appraiser is qualified "with respect to any specific appraisal unless" the appraiser "demonstrates verifiable education and experience in valuing the type of property subject to the appraisal." 26 U.S.C. § 170(f)(11)(E)(iii)(I).  *See Woolford v. Va. Dep't of Taxation*, 294 Va. 377, 386, 806 S.E.2d 398, 402-403 (Va. 2017) (interpreting 26 U.S.C. § 170(f)(11)(E)(iii)(I) under Virginia's "governing statute" for charitable donations, which "incorporates the federal law definition of 'qualified appraiser'").

175. Nothing in Mr. Brazier's numerous reports attacking GDC's appraisal methodology and associated business practices, and nothing in publicly available information about Mr. Brazier's education, training and experience, shows that Mr. Brazier has the education and experience required to qualify him to value the donated building materials at issue, or that Mr. Brazier has the required competence and experience needed to provide accurate evaluations of GDC's appraisal methodology and associated business practices, let alone to deem GDC's appraisals "unqualified."  *See Estate of Kollsman v. Commissioner*, T.C. Memo. 2017-40, at * 6 (2017), *aff'd*, 777 Fed. App'x, (9th Cir. 2019) (unpub.)  ("The opinions of expert witnesses are weighed according to their qualifications and other relevant evidence" (citing *Anderson v. Commissioner*, 250 F. 2d 242, 249 (5th Cir. 1957), *aff'g in part, remanding in part* T.C. Memo. 1956-178, and *Johnson v. Commissioner*, 85 T.C. 469, 475 (1985)).  *See also Jarre v. Commissioner*, 64 T.C. 183, 188-189 (1975) (in rejecting IRS's valuation expert's conclusion, court stated that it considers experts' "demonstrated qualifications to form an opinion, their familiarity with the background…their familiarity and contact with the potential market for the contributed

material, and their knowledge of the material," finding "it important that petitioner's experts…deal daily in cinema memorability, while respondent's expert does not," and while IRS expert could "research[ ] and evaluat[e] the market" the court had to consider the IRS expert's unfamiliarity with the donated items and relevant market "in weighing respondent's expert's testimony").

176. Mr. Brazier's "Technical Reviews" or "desk reviews" do not reflect that he performed any physical inspections of the donated materials, or did anything to determine whether, in fact, given the particular donation and the relevant market conditions, the Comparable Sales Method or another appraisal approach would be a more reliable method of determining FMV.

177. Nor do Mr. Brazier's "Technical Reviews" or "desk reviews" demonstrate that Mr. Brazier did anything to determine whether the Cost-Less-Depreciation method produced a lower, higher, or equivalent valuation than a valuation produced using a different valuation method, or that Mr. Brazier otherwise did anything other than providing an opinion, based on a template used for all his "reviews," justifying the conclusion the IRS wanted him to reach.

178. Mr. Brazier's automatic, *ipse dixit* rejections of GDC's appraisals for Second Chance donors do not provide a legitimate basis for concluding those appraisals are "not qualified." *See Estate of Kollsman*, T.C. Memo. 2017-40 at * 6 ("Opinion evidence that does not appear to be based upon disclosed facts is of little or no value" (citing *Balaban & Katz Corp. v. Commissioner*, 30 F. 2nd 807, 807-808 (7th Cir. 1929), *aff'g* 6 B.T.A. 610 (1927)) "In the context of valuation cases, experts lose their usefulness (and credibility) when they merely become advocates for the position argued by a party" (citing *Laureys*

*v. Comm'r*, 92 T.C. 101, 129 (1989), *Buffalo Tool & Die Mfg. Co. v. Comm'r*, 74 T.C. 441, 452 (1980)).

179. Mr. Brazier's "Technical Reviews" or "desk reviews" are unsupported and conclusory, affording no reasoned basis for the IRS's routine rejections of GDC's appraisals for Second Chance donors as unqualified. *See also Estate of Kollsman*, T.C. Memo. 2017-40, at * 9 (noting importance of "comparable works" in art valuation, and citing *Reynolds v. Commissioner*, T.C. Memo. 1981-714, 43 T.C.M. (CCH) 115, 116 (1981) for proposition that "'Petitioners' expert has "the more impressive credentials but essentially asks the Court to accept his conclusions without offering an adequate explanation as to how these conclusions can be reached'").

180. Mr. Brazier never recognizes, let alone explains, why GDC's appraisals for non-Second Chance donors, applying the same principles and methods as GDC uses for its appraisals for Second Chance donors, are "qualified" but the appraisals for Second Chance donors are "not qualified."

181. Mr. Brazier nowhere demonstrates, for any of the appraisals he rejected as "unqualified," that any actually "comparable sales" existed from a truly "comparable" market.

182. In rejecting the Plaintiffs' deconstruction appraisals, the IRS is relying on evaluations prepared by an appraiser who appears *not* to be a qualified personal property appraiser of charitable donations of deconstructed building materials to support the IRS's challenges to the business practices of the Plaintiffs.

183. In deeming GDC's appraisals for Second Chance donors "not qualified," the IRS is relying on evaluations by an appraiser who not only lacks the requisite credentials and

experience, but whose unreasoned and unsupported opinions amount only to IRS arguments thinly disguised as independent assessments.

184. WHEREFORE, the Plaintiffs seek a Declaratory Judgment that the IRS cannot rely on Mr. Brazier's "Technical Reviews" or "desk reviews" for the IRS's challenges to GDC's appraisals, appraisal methodology and associated business practices.

## Count II: Declaratory Judgment that Cost-Less-Depreciation Method is Valid Method for Determining Fair Market Value of Deconstructed Building Materials

185. The Plaintiffs reallege, and incorporate by reference as if they were set forth in full herein, all of the allegations contained in the prior paragraphs of this Complaint.

186. Ignoring the IRS's own publications and requirements, and established case law, the IRS and Mr. Brazier have been invariably concluding, without any analysis in any case, that GDC's use of the Cost-Less-Depreciation methodology for determining FMV for Second Chance donors is not a valid valuation methodology.   As a matter of law, this arbitrarily, capriciously and selectively-applied – to Second Chance donors - reflexive and routine rejection of the Cost-Less-Depreciation method is simply wrong, legally and factually.

187. The IRS's own Treasury Regulations expressly recognize the "Cost-Less-Depreciation" valuation methodology for determining FMV.  *See* Treasury Reg. § 1.170A-13(c)(3)(ii)(J)).

188. Further, established case law endorses the use of the Cost-Less-Depreciation method. *Northern Natural Gas Co. v. United States*, 1972 WL 419, at * 3 (D. Neb. Jan. 25, 1972), *aff'd*, 470 F. 2d 1107, 1110 (8th Cir. 1973), involved precisely the same issue facing each of the Plaintiffs' clients, the issue on which the Plaintiffs' business entirely depends, namely, "how best to establish the FMV of the charitable donation for tax

purposes?"  In *Northern Natural Gas* the court upheld the Commissioner's reliance on an expert valuation opinion that employed the Cost-Less-Depreciation method of establishing FMV for tax purposes.  *See also Goodman v. United States*, 512 F. Supp. 155, 159  (E.D. Mich. 1981) (involving valuation of mobile home parks; noting "where no market for [similar] assets exist[s], the direct [sales] comparison method is not useful;" IRS experts "testified that the reproduction cost method was the only method appropriate for the determination of value" and cited *Northern Natural Gas*, 470 F. 2d at 1110, for proposition: "where no used market exists for comparison purposes, the reproduction cost method is a well-accepted determinant of value"); *Emanouil v. Commissioner*, T.C. Memo. 2020-120, at * 15 ("three commonly accepted approaches (capitalization, cost, or comparable sales) to determine fair market value"); *Cave Buttes, L.L.C. v. Commissioner*, 147 T.C. 338, 358 (2016) ("There are several accepted methods of estimating fair market value for any property, including comparable sales, income (or discounted cashflow) and replacement cost" (citing *Terrene Invs., Ltd.. v. Commissioner*, T.C. Mem, 2007-218); *Brannan Sand & Gravel Co., LLC v. Commissioner.*, T.C.Memo. 2020-76, at * 5 (citing Treasury Reg. §1.170A-13(c)(3)(ii)(J) ("qualified appraisal" must contain "[t]he method of valuation used to determine the fair market value, such as the income approach, the market-data approach and the replacement Cost-Less-Depreciation approach"); *Scheidelman v. Commissionerr*, 682 F.3d 189, 194-95 (2d Cir. 2012) (citing Treasury Reg. §1.170A-13(c)(3)(ii)(J)); *Cornelius v. Commissioner,* 56 T.C, 976, (1971) (fire loss case; replacement Cost-Less-Depreciation is acceptable method of determining fair market value).

189.  Still further, the IRS's automatic and conclusory rejection of the replacement-Cost-Less-Depreciation method for determining the FMV of a charitable donation to Second Chance of deconstructed building materials, appliances and fixtures violates the rule that "[t]he fair market value of property at any given date is a question of fact to be decided in the light of all the evidence, and no set rules, methods, or formulae are controlling." *Edwards v. Commissioner*, T.C. Memo. 1973-252 (citing *Newaygo Portland Cement Co. v. Helvering*, 27 B.T.A. 1097, 1106 (1933), *aff'd*, 77 F. 2d 536 (D.C. Cir. 1935)). *See also Emanouil*, T.C. Memo. 2020-120, at * 17 ("Valuation is not a precise science, and the fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record." (citing cases)).

190.  Even still further, the IRS has not only in the past, before the IRS began its siege against donors to Second Chance in the IRS's quest to put Second Chance out of business, but even afterwards, accepted charitable deductions based in whole or in part on the Cost-Less-Depreciation valuation method.  As stated above, HARVEST Eco-Salvage touts the IRS's routine acceptance of millions of dollars worth of charitable deductions based on the Cost-Less-Depreciation method, with those deductions based on unqualified real estate, not personal property, evaluations to boot.

191.  The IRS's categorical rejection of the Cost-Less-Depreciation method for valuing deconstructed items, which utterly ignores the economic reality endorsed by case law and the IRS's own regulations that non-cash charitable donations must be evaluated on a case-by-case basis, also fundamentally ignores that the market for used building materials is not only thin, but highly fragmented.  A number of empirical studies describe this fact.

192. The Bureau of Labor and Statistics ("BLS") divides the country into thirty-two (32) major metro markets for purposes of calculating the Consumer Price Index. Each major metro market itself has numerous sub-markets. For example, the major metro market the BLS identifies as the DMV (District of Columbia (DC), Maryland, Virginia) Bureau itself contains numerous sub-markets. The deconstructed items from a house in Fredericksburg, Virginia would not have the same value as they would in McLean, Virginia, or in Bethesda, Maryland. An appraiser can search far and wide across the country and beyond for "comparable sales" for purposes of valuing deconstructed items from a house in Fredericksburg, Virginia. But the often substantial differences in economic and regulatory conditions in the many markets and sub-markets across the nation mean that no such "comparability" is valid unless it takes into account, and makes numerous adjustments, for those differences. Just because a particular lighting fixture might sell for $250 in Beverly Hills does not mean the same price would obtain in Fredericksburg, Virginia. Or even that a particular item that can be salvaged and re-sold in one place can be re-sold and re-used in another place.

193. In short, whatever attractive simplicity and appeal of the "comparative sales method" of valuation, which the IRS seems entirely willing to accept, and which the IRS cites in Mr. Brazier's critiques of the Plaintiffs' appraisals, as an always presumptively valid valuation method in *all* cases without any regard to the thin and highly fragmented market for used building materials, that method is fraught with arbitrariness and uncertainty in light of the inherently deeply individualized and idiosyncratic regulatory, economic and commercial nature of the country's many various markets and sub-markets.

194. GDC needs to know whether it should use what, in many cases, would be artificial and not truly comparable data points, from vastly different markets, which provide pricing information that often will have little if any relevance to the deconstruction appraisal at hand, and that would require numerous difficult and rough adjustments and other "extraordinary assumptions," instead of using the quarterly updated, objective, zip-code specific information from R.S. Means, an I.R.S.- approved vendor.

195. GDC's appraisals use the R.S. Means software. Chapter 3 of the IRS's Cost Segregation Auditors Handbook endorses R.S. Means as a "reliable published source" and GDC's descriptions of the appraised materials are based on the R.S. Means software, which is updated every quarter and which software the IRS has already approved.  The R.S. Means software specifically uses zip codes to ensure valuations are informed by the most relevant geographical market, and is regularly updated to reflect timing concerns in the market, to ensure the most accurate possible value calculation.

196. The R.S. Means software uses hard, objective, updated data, and is surely no less accurate,  than a "sales comparison approach" that uses raw pricing data (subject to undefined and arbitrary adjustments by an appraiser trying to compare different markets) from vastly different geographic, regulatory and economic markets, from different times, which is what the "Comparable Sales Method"  often entails given the highly fragmented, geographically idiosyncratic and timing-dependent  nature of the used building materials market.

197. The IRS and Mr. Brazier nowhere show, in any case, that the FMV produced by the Cost-Less-Depreciation method as employed by GDC results in FMVs for Second Chance donors that are higher, lower or equivalent to FMVs produced by alternative

valuation methods, or that GDC's use of the Cost-Less-Depreciation method is less reliable for producing a FMV than the FMV that would have resulted from using a different appraisal method, such as the comparable sales or income approaches.

198. The IRS and Mr. Brazier nowhere demonstrate why some appraisal method other than the Cost-Less-Depreciation method should have been used in any particular case.

199. The IRS and Mr. Brazier nowhere explain why the Cost-Less-Depreciation method produces acceptable FMVs for non-Second Chance donors, but does not produce acceptable FMVs for Second Chance donors.

200. Further, and fundamentally, that the IRS disagrees with the FMV determined by an otherwise "qualified appraisal" does not make the appraisal "unqualified." *See, e.g., Emanouil*, T.C. Memo. 2020-120, at * 10 (although IRS challenged appraisal's FMV determinations, the statutory notice of deficiency "did not state that the Emanouil's failed to satisfy the 'qualified appraisal' requirements of section 170(f)(11)(C)).

201. Equally fundamentally, the IRS's disfavor for a particular valuation methodology does not make the appraisal "not qualified." *See Scheidelman v. Commissioner.*, 682 F. 3d 189, 196-197 (2d Cir. 2012) (vacating Tax Court opinion in façade easement valuation case where Tax Court had rejected taxpayer's expert's valuation method; "For the purpose of gauging compliance with the reporting requirement, it is irrelevant that the IRS believes the method employed was sloppy or inaccurate, or haphazardly applied – it remains a method, and [the taxpayer's expert] described it.  The regulation requires only that the appraiser identify the valuation method 'used;' it does not require that the method adopted be reliable.")

202. In rejecting in conclusory fashion, by simple fiat, the Cost-Less-Depreciation method for the Plaintiffs' appraisals for Second Chance donors, the IRS, through Mr. Brazier, never stirs itself to show, for example, the facts purportedly supporting the application of the Comparable Sales method, including: the existence of an active market, operating at the same time as the challenged charitable donation and subject to the same macroeconomic, microeconomic and regulatory conditions that prevail in the location where the donation is being made, so that the comparison is reasonably likely to produce an accurate FMV for donated items. *See Rajagopalan v. Commissioner.*, T.C. Memo. 2020-159, 2020 WL 6796038, at * 5 ("The comparable sales method looks at transactions that involve properties similar to the subject property, completed at arm's length, and sold within a reasonable time of the valuation date." (citing cases)).

203. In its purely conclusory, unreasoned rejections of GDC's use of the Cost-Less-Depreciation method for Second Chance donors, the IRS reads its own regulation approving that valuation method, Treasury Reg. § 1.170A-13(c)(3)(ii)(J), out of existence.

204. Where a meaningfully active, regulatorily analogous and economically similar market does not exist and the "comparable sales" valuation approach is therefore inappropriate, it is proper for GDC to employ the Cost-Less-Depreciation method, using the R.S. Means software and making other situation-specific judgments as may be necessary or appropriate, to make a determination of the FMV of deconstructed building materials and items, as set forth in Treasury Reg. § 1.170A-13(c)(3)(ii)(J), and as recognized by established case law. *See, e.g., Emanouil*, T.C. Memo. 2020-120, at * 15; *Cave Buttes*,

147 T.C. at 358; *Terrene*, T.C. Mem, 2007-218; *Brannan Sand & Gravel*, T.C. Memo. 2020-76, at * 5; *Scheidelman*, 682 F.3d at 194-95.

205. Where an active market in the deconstructed items to be valued does not exist, or where the economic and regulatory conditions applicable to such a market are not demonstrably comparable to the economic and regulatory conditions of the market area in which the deconstructed items are donated, use of the Cost-Less-Depreciation methodology, employing the R.S. Means software, produces a "probative correlation between replacement cost and FMV."  *Gardner v. Commissioner,* T.C. Memo. 2017-165, 2017 WL 3670197, at * 8 ("if an active market exists, we generally rely on comparable sales…Replacement cost may be a relevant measure of value 'where the property is unique, the market is limited, and there is no evidence of comparable sales'" (quoting *Robson v. Commissioner*, T.C Memo. 1997-176, 73 T.C.M. (CCH) 2574, 2575, *aff'd*, 172 F. 3d 876 (9th Cir. 1999), in turn citing *Estate of Palmer v. Commissioner*, 839 F. 2d 420, 424 (8th Cir. 1988), *rev'g* 86 T.C. 66 (1986)).  *See also Crocker v. Commissioner.*, T.C. Memo. 1998-204, at * 38 ("Generally, a correlation between replacement cost and fair market value has been proved where the property is unusual in nature and other methods of valuation, such as comparable sales or income capitalization, are not applicable because of the property's uniqueness and non-income-producing nature."); *Estate of Miller v. Commissioner.*, T.C. Memo. 1991-515, 1991 WL 200224 (same).

206. Repeatedly rejecting the Audited Donors' charitable gift deductions because they rely on an "unqualified" appraisal because the Plaintiffs employed the "Cost-Less-Depreciation" valuation methodology provided by the R.S. Means system, the IRS creates the necessity of a Declaratory Judgment.

207. As alleged above: (i) the IRS itself recognizes the "Cost-Less-Depreciation" method as a valid valuation methodology; (ii) the IRS has in the past and continues, even after challenging the Audited Donors' charitable deductions, to accept the "Cost-Less-Depreciation" methodology using the R.S. Means software program for donors who are donating to charitable organizations other than Second Chance; (iii) the Tax Court has blessed the "Cost-Less-Depreciation" methodology; (iv) the IRS's apparent contention that a "one size fits all" valuation methodology, namely the "comparable sales" approach, is required for every donation of deconstructed materials is contradicted by the IRS's own published statements, the case law, and basic valuation principles; (v) the IRS has in the past – under the same regulations and requirements that apply to the Audited Donors today - accepted hundreds of appraisals by GDC and Mr. Smith as "qualified" that employed, in whole or in part, the "Cost-Less-Depreciation" valuation methodology; (vi) even after the IRS denied the charitable donation deductions of the Audited Donors based on the assertion that the supporting appraisal by GDC and Mr. Smith was "unqualified," the IRS has continued to accept deductions for charitable donations to charitable organizations other than Second Chance that were based on appraisals by GDC and Mr. Smith that the IRS has found were "qualified" – even though those appraisals used the same methodology employed for the appraisals relied upon by the Audited Donors that the IRS has deemed "unqualified.

208. Routinely and categorically rejecting the Audited Donors' use of appraisals employing the Cost-Less-Depreciation valuation method, the IRS runs squarely afoul of the teaching of *Estate of Kaplin v. Commissioner*, 748 F.2d 1109, 1111 (6th Cir. 1984), that the replacement cost valuation methodology "is a traditionally accepted valuation

method and should not be totally ignored by the Tax Court [or the IRS] without strong justification." *Kaplin* reversed a Tax Court decision that declined to consider the replacement cost valuation method used for an old and run-down building.

209. The Audited Donors' appraisals fulfill the purpose animating Treasury Regulation § 1.170A-13(c)(3) because they provide the IRS sufficient information to analyze the Audited Donors' charitable donation deductions.

210. In rejecting the Cost-Less-Depreciation valuation method, the IRS ignores the actual facts.  The Audited Donors' donated materials are individualized components of differing structures and include items such as appliances, plumbing fixtures, kitchen fixtures, countertops, doors, windows, cabinetry, flooring, electrical fixtures, lighting and numerous other items.  The items vary in age, quality, type, model and size.  The market for such items is itself demonstrably decentralized, as discussed above rendering use of the Comparable Sales Method unsystematic, arbitrary and unreliable in many cases.

211. The Audited Donors' appraisals are highly detailed, contain a clearly descriptive analysis of the application of the Cost-Less-Depreciation method to the individual donations, and expressly set forth all conditions, assumptions, facts and calculations employed to arrive at FMV.

212. The Audited Donors' appraisals state that they adhere to, and show that they satisfied, all generally accepted valuation rules and requirements, and specifically those set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP").   As to every one of the Audited Donors, the IRS ignores the legal rule that compliance with USPAP "is evidence that the appraiser is applying methods that are generally accepted within the

appraisal profession.  Therefore, compliance with USPAP is an indication that the appraiser's report is reliable."  *Jackson Crossroads, LLC v. Commissioner*, T.C.Memo. 2024-111.

213. WHEREFORE, the Plaintiffs seek a Declaratory Judgment that their use of the Cost-Less-Depreciation valuation methodology is appropriate, absent a showing, based on the facts of the particular case, that a different valuation methodology was required to be used.

**Count III: Declaratory Judgment that a Detailed Description of the Donated Property is Not Required in the Appraisal**

214. The Plaintiffs reallege, and incorporate by reference as if they were set forth in full herein, all of the allegations contained in the prior paragraphs of this Complaint.

215. 26 U.S.C. § 170 ("Section 170") generally governs charitable contributions and gifts and the requirements for establishing tax deductions for making such gifts.

216. 26 U.S.C. § 170(f)(11)(C) states: "In the case of contributions of property for which a deduction of more than $5,000 is claimed, the requirements of this subparagraph are met if the individual, partnership or corporation obtains a *qualified appraisal* of such property and attaches to the return for the taxable year in which such contribution is made such information regarding such property and such appraisal as the Secretary may require." (emphasis added).

217. One of Section 170's implementing regulations, 26 C.F.R. § 1.170A-13(c)(3)(i), states that a "qualified appraisal" within Section 170's intendment is an appraisal document that, includes, *inter alia*, "the information required by paragraph (c)(3)(ii) of this section."

218. In turn, 26 C.F.R. § 1.170A-13(c)(3)(ii) lists eleven informational items required to be contained in a qualified appraisal.

219. One of the eleven items that a qualified appraisal must contain is "a description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed."  26 CFR § 1.170A-13(c)(3)(ii)(A).  All of the GDC appraisals that the IRS challenges, through Mr. Brazier, satisfy this "description" requirement.

220. GDC's appraisals use the R.S. Means software. Chapter 3 of the IRS's Cost Segregation Auditors Handbook endorses R.S. Means as a "preferred vendor," and GDC's descriptions of the appraised materials are based on the R.S. Means software, which is updated every quarter, is zip-code specific, objective, and which software the IRS has already approved.

221. GDC's appraisals describe, and pictorially represent, all of the items and materials that are being deconstructed and donated, excluding items and materials that are "consumed" or "destroyed" in the deconstruction process.  No reasonable person and no reasonable IRS agent could have any doubt about the nature and type of the property being appraised and donated, namely, used building materials.  Dimension lumber, fixtures, appliances – all are identified in the Plaintiffs' appraisals.

222. WHEREFORE, the Plaintiffs seek a Declaratory Judgment that their method of describing the condition of the property being donated satisfies all applicable statutes and regulations.

**<u>Count IV: Declaratory Judgment that a Detailed Description of the Condition of Each Deconstructed and Donated Item is Not Required in the Appraisal</u>**

223. The Plaintiffs reallege, and incorporate by reference as if they were set forth in full herein, all of the allegations contained in the prior paragraphs of this Complaint.

224. The IRS, through Mr. Brazier, has repeatedly rejected GDC's appraisals, for donors to Second Chance, as "unqualified" claiming those appraisals do not sufficiently describe the "physical condition" of the donated items as required by 26 CFR § 1.170A-13(c)(3)(ii)(B).

225. However, all of the GDC appraisals challenged by the IRS include a statement concerning the physical condition of the property, using descriptors such as "good." That is all that the regulations require.

226. The IRS has itself stated that no physical inspection of to-be-donated physical items is required.  In an IRS Webinar on December 3, 2024 and December 4, 2024, Meredith Meuwly, an IRS employee and ISA instructor, taught the seven-hour Uniform Standards of Professional Appraisal Practice ("USPAP") Update class for 2024.  In the December 3, 2024 portion of the Update class, Ms. Meuwly stated that "the IRS does not have a requirement that an appraiser must inspect or personally photograph an item being appraised."  Continuing, Ms. Meuwly said, "[t]he IRS does however require appraisers to follow USPAP."

227. Under USPAP, appraisers are required to disclose whether they did or did not inspect the property being appraised.  If the appraiser did not personally inspect the property and relied on another person to visually inspect the property, the appraiser is required to identify the person who made such visual inspection.   All of the Plaintiffs' appraisals, including all of the appraisals for the Audited Donors, fully satisfy that USPAP requirement.

228. Further, the Cost-Less-Depreciation methodology's application of depreciation to the valuation analysis accounts for the physical condition of the donated building materials in a systematically rigorous way regularly used by industry professionals.

229. Finally, the IRS's apparent position – found nowhere in the governing statutes or regulations - that every single deconstructed item, every piece of dimension lumber, every faucet, every shingle, must be assigned an individual description of condition is highly impractical and would, in many cases, make it virtually impossible to complete an appraisal valuation given the sheer number of items involved, especially for a residence or commercial structure of any substantial size.

230. WEHREFORE, the Plaintiffs seek a Declaratory Judgment that their method of describing the condition of the donated materials satisfies all applicable statutes and regulations.

**Count V: Declaratory Judgment that The Cross-Checking Process GDC and Second Chance Employ to Determine and Confirm the Items Actually Deconstructed and that Become Subject to Second Chance's Care, Custody and Control for Donation Purposes Satisfies all Applicable Requirements for Identification of Donated Items**

231. The Plaintiffs reallege, and incorporate by reference as if they were set forth in full herein, the allegations contained in the prior paragraphs of this Complaint.

232. In consistently alleging that GDC's appraisals for Second Chance donors are "unqualified" because the initial *in situ* appraisal of building materials does not correspond to the materials actually deconstructed and donated to Second Chance, the IRS ignores the iterative cross-checking process by which GDC and Second Chance confirm that the final appraisal valuation is based only on the items actually deconstructed and donated to Second Chance.

233. In order to ensure that the final FMV of a donation is as accurate as possible, and is based on the materials actually donated to Second Chance, GDC routinely works with Second Chance to review the preliminary list of items against the list of items that have been deconstructed and that either are transported to Second Chance's warehouse for resale (as shown by truck manifests) or that, in some circumstances, are sold while still at the deconstruction site to interested parties.

234. WHEREFORE, the Plaintiffs request a Declaratory Judgment that its method for confirming the final valuation of donated materials is based on the materials actually donated to Second Chance and complies with all applicable statutes and regulations.

**<u>Count VI: Declaratory Judgment that Qualified Appraisal Is Properly Dated Contemporaneously with Date of Donor's Charitable Contribution Agreement with Second Chance</u>**

235. The Plaintiffs reallege, and incorporate by reference as if they were set forth in full herein, all of the allegations contained the prior paragraphs of this Complaint.

236. The relevant Treasury Regulation governing the date when a charitable contribution is made is 26 C.F.R. § 1.170A-1(c)(1), which provides:

If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property *at the time of the contribution*, reduced as provided in section 170(e)(1) and paragraph a of § 1.170A-4 [governing contributions of ordinary income and capital gain property], or section 170(e)(3) and paragraph (c) of § 1.170A-4A [governing donations of inventory and other property by corporations]. (emphasis added)

237. The Agreement for Charitable Contribution between donors and Second Chance states that the donor is transferring to Second Chance, as of the date of the Agreement, all of the donor's right, title and interest in the existing improvements, buildings and fixtures of the property, which are constructively severed from the real estate, to Second Chance:

"Owner hereby donates, conveys and gives to Second Chance all of the Owner's right, title and interest in the Improvements."

238. Determining the "time of the contribution" of a charitable donation of property other than money requires analysis of the governing state law for ascertaining the date when a donor has divested herself of property rights, her right, title and interest in the donated item, and analysis of federal law to determine the applicable tax treatment. *See Estate of Hoensheid v. Commissioner*, T.C. Memo. 2023-34, 2023 WL 2519413, at * 10 (citing cases). *See also Estate of Miller v. Commissioner.*, T.C. Memo. 1991-515, 1991 WL 200224 ("to determine whether delivery" of charitable gift "was effectuated, we look to state law" (citations omitted)).

239. GDC's appraisals all satisfy the timing condition of the "qualified appraisal" requirement because they are "made not earlier than 60 days prior to the date of contribution of the appraised property" (26 C.F.R. § 1.170A-13(c)(3)(A)) and were "received by the donor before the due date (including extensions) of the return" on which the charitable donation deduction was claimed. 26 C.F.R. § 1.170A-13(c)(3)(iv)(B).

240. The IRS, relying on Mr. Brazier's conclusory determinations of the effective date of donor contributions, has routinely rejected GDC's appraisals for Second Chance donors as "unqualified," alleging that the date of GDC's appraisals are inaccurate.

241. The IRS contends that the correct donation date is not the date on which the donors, in their Charitable Contribution Agreements, ceded to Second Chance all right, title and interest in the constructively severed materials, but, rather, is the date the deconstructed materials "cross the threshold" of Second Chance's warehouse. However, in making this

assertion as part of its systematic rejection template, the IRS nowhere addresses the import of state law on determining when a gift is deemed complete.

242. Despite the clear donative intent to make a completed gift expressly stated in the Agreements for Charitable Contribution between Second Chance and its donors, the IRS simply asserts that no donation is effective for tax purposes until the donated materials actually enter Second Chance's possession and cross Second Chance's threshold. Accordingly, the IRS asserts, the appraisals do not provide the FMV of the donated property on the date of the actual donation.

243. The IRS is required to "first look to state law for the threshold determination of whether [the taxpayers] divested themselves of their property rights via a gift." *Estate of Hoenscheid*, T. C. Memo. 2023-34, 2023 WL 2519413, at * 10 (citing *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985)). The IRS has failed in every case to provide any analysis of the relevant state laws that determine when the charitable donation at issue was "delivered" for state law purposes.

244. WHEREFORE, the Plaintiffs request a Declaratory Judgment that GDC's appraisals cannot be deemed "unqualified" on the basis of appraisal's date unless the IRS has first determined, as a matter of state law in each case, when the donor's gift was made for charitable donation purposes.

### Count VII: Declaratory Judgment that GDC's Appraisals are Qualified Appraisals Even if IRS Disagrees with FMV stated in Appraisal

245. The Plaintiffs reallege, and incorporate by reference as if they were set forth in full herein, the allegations contained in the prior paragraphs of this Complaint.

246. The IRS has repeatedly stated that the Plaintiffs' appraisals for Second Chance donors are not "qualified appraisals" based on the IRS's automatic rejection of GDC's use of the

Cost-Less-Depreciation valuation methodology for those donors and the IRS's conclusory disagreement with the resulting FMV produced in the GDC appraisals for those donors.

247. Under the governing statute, 26 U.S.C. § 170(f)(11)(C), a "qualified appraisal" is required "for contributions of more than $5,000."

248. A "qualified appraisal" is one that comports with the "regulations or other guidance prescribed by the Secretary" and "is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed" by the Secretary. 26 U.S.C. § 170(f)(11)(E)(i) (I-II).

249. Except where the appraiser fails to "demonstrate[ ] verifiable education and experience in valuing the type of property subject to the appraisal" or "has been prohibited from practicing before the Internal Revenue Service by the Secretary…at any time during the 3-year period ending on the date of the appraisal," an appraiser is "qualified" for IRS purposes if the appraiser "has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in regulations set forth by the Secretary;" "regularly performs appraisals for which [the appraiser] receives compensation, and meets such other requirements as may be prescribed by the Secretary in guidance or other regulations." 26 U.S.C. § 170(f)(11)(E)(ii)(I-III).

250. All of the GDC appraisals for Second Chance donors challenged by the IRS satisfy the requirements of the foregoing statutory provisions, demonstrating Mr. Smith is a "Qualified Appraiser."

251. All of Mr. Smith's appraisals for Second Chance donors challenged by the IRS satisfy the requirements of the regulations that further identify the requirements of a "qualified appraisal."  26 C.F.R. §§ 1.170A-13(c)(2)(A) and 1.170A-13(c)(3) (i-ii).

252. That the IRS disagrees with the methodology Mr. Smith has used, or the resulting FMV determination Mr. Smith has reached, does not mean either that Mr. Smith is not a qualified appraiser or that the appraisals the IRS has challenged are not qualified appraisals.  *See Scheidelman v. Commissioner*, 682 F. 3d 189, 196-197 (2d Cir. 2012) (regulations require that appraiser describe valuation method used, not that IRS agrees with the method or valuation produced).

253. As the IRS's repeated challenges to GDC's methodology and FMV conclusions reveal, the GDC appraisals provide the IRS with all the information the IRS needs to analyze, and, if appropriate, challenge the conclusions of the appraisals provided by GDC.  *See Smith v. Commissioner* T.C. Memo. 2007-368, 2007 WL 4410771, at * 13 (purpose of substantiation requirements for charitable donations is to "provid[e] the Commissioner with sufficient return information to effectively monitor the possibility of overvaluations of charitable contributions" (citing *Hewitt v. Commissioner*, 109 T.C. 258, 265, 1997 WL 668995 (1997), *aff'd without published opinion*, 166 F. 3d 332 (4th Cir. 1998)); *Reri Holdings I, LLC v. Commissioner*, 143 T.C. 41, 74 (2014) (same).

254. WHEREFORE, the Plaintiffs request a Declaratory Judgment that the IRS's disagreement with the FMV contained in GDC's appraisals is not a valid basis for the IRS to concluded that the appraisals are therefore not "qualified appraisals."

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court enter its Order granting Plaintiffs a Declaratory Judgment as follows:

A. On Count I, that the IRS is prohibited relying on the "Technical Reviews," "desk reviews" or other work by Mr. Brazier to conclude that GDC's appraisals are "unqualified," because Mr. Brazier is not a qualified appraiser for any purposes relevant to determining whether the Plaintiffs' appraisal methodology and related business practices comply with all applicable statutes and regulations;

B. On Count II, that the Cost-Less-Depreciation Method is a valid and appropriate method for determining Fair Market Value for purposes of appraisals supporting charitable donations of deconstructed building materials, that GDC is entitled to exercise its professional judgment in deciding to employ the Cost-Less-Depreciation valuation methods, and that use of that method does not make GDC's appraisals "unqualified" or its appraiser "not qualified;"

C. On Count III, that a detailed description of each constituent item of the donated materials is not required for GDC's appraisals to be "qualified appraisals" and that a general description such as "deconstructed building materials, including lumber, interior and exterior finishes and fixtures such as lighting, kitchen and bathroom appliances" satisfies the statutory and regulatory requirements;

D. On Count IV, that a detailed description of the condition of each constituent item of the donated materials is not required for GDC's appraisals to be "qualified appraisals."

E. On Count V, that the cross-checking process that GDC uses to establish which of the structural components, materials and fixtures included in GDC's preliminary appraisal

are actually deconstructed and received by Second Chance satisfies all applicable requirements for GDC's appraisals to be "qualified appraisals;"

F.  On Count VI, that GDC's appraisals dated at or near the date of the Agreements for Charitable Contribution between Second Chance and its donors satisfy all requirements for the dating of a qualified appraisal;

G.  On Count VII, that IRS disagreement with GDC's use of the IRS-approved Cost-Less-Depreciation method and the resulting FMVs produced by that method does not mean, under the governing statute and regulations; either that GDC is not a "qualified appraiser" or that its appraisals are not "qualified appraisals;"

H.  Awarding GDC and Mr. Smith their reasonable litigation costs, including attorneys' fees under 26 U.S.C § 7430; and

I.    Awarding GDC and Mr. Smith such other Declaratory Judgment and other relief as the

    Court finds just and proper under all the circumstances,

DATED:  September 14, 2025

                               Respectfully submitted,

                               /s/ Barry Coburn

                             _____

                             Barry Coburn, Bar No. 07910
                             Coburn, Greenbaum & Eisenstein PLLC
                             1710 Rhode Island Avenue, N.W.
                             Second Floor
                             Washington, DC 20036
                             (202) 643-9472
                             (866) 561-9712 (fax)
                             barry@coburngreenbaum.com

                             Lloyd Liu, Bar No. 80624
                             Bennett, LoCicero & Liu
                             1707 L Street NW
                             Suite 1030
                             Washington, DC 20036
                             (202) 860-6543
                             lliu@bllfirm.com

                             Stephen G. Grygiel, Bar No. 09169
                             Grygiel Law, LLC
                             127 Coventry Place
                             Clinton, NY 13323
                             (407) 505-9463
                             stephengrygiel22@gmail.com

                             *Counsel for Plaintiff,*
                             *NoVaStar Appraisals, Inc.*
                             *d/b/a Green Donation Consultants*